# In the United States Court of Federal Claims

No. 12-197 C
(Filed: April 26, 2012)
(Released for Publication: May 11, 2012)[1]

```
*********************************************
                                            *
360TRAINING.COM, INC.,                      *
                                            *
                Plaintiff,                  *
                                            *
        v.                                  *
                                            *
THE UNITED STATES,                          *
                                            *
                Defendant,                  *
                                            *
        and                                 *
                                            *
CLICKSAFETY.COM, INC.,                      *
                                            *
                Defendant/Intervenor.       *
                                            *
*********************************************
```

*Carl Alexander Gebo*, Gordon & Rees LLP, Atlanta, GA, for Plaintiff.

*Joseph Alan Pixley*, Trial Attorney, Civil Division, United States Department of Justice, Washington, DC, for Defendant.

*Daniel James Kelly*, McCarter & English, LLP, Boston, MA, for Defendant/Intervenor.

_____

## OPINION

_____

**DAMICH**, Judge:

_____

[1] This opinion originally was issued under seal on April 26, 2012, pending a determination among the parties whether to propose redactions of competition-sensitive, proprietary, confidential, or otherwise protected information. Although Plaintiff submitted proposed redactions to the Court, the Court has determined that the information Plaintiff has proposed to redact is not competition-sensitive, proprietary, confidential, or otherwise protected information. Therefore, the Court is releasing the opinion in full. The Court, however, has made some minor edits to section III.C.2. of this opinion.

Plaintiff 360Training.com, Inc., filed this case as a post-award bid protest on March 27, 2012.  Plaintiff had submitted a proposal in response to a "Request for Applications" ("RFA" or "Solicitation") issued by the Occupational Safety and Health Administration ("OSHA") of the United States Department of Labor.  OSHA was seeking to authorize qualified vendors to provide online OSHA Outreach Training Program courses ("outreach courses") and successful applicants would be awarded a nonfinancial "cooperative agreement."  Prior to the RFA, Plaintiff was an approved online provider of outreach courses.  Plaintiff challenges OSHA's non-selection of Plaintiff's application, alleging that OSHA acted arbitrarily, capriciously, and not in accordance with the law in evaluating its application.

On April 6, 2012, the Government filed a motion to dismiss for lack of subject matter jurisdiction.  The Government argues that, under the Tucker Act, 28 U.S.C. § 1491 (2006), this Court's bid protest jurisdiction is limited to claims "in connection with a procurement or a proposed procurement."  Def.'s Mot. Dismiss at 6.  It argues that the definition of "procurement" under the Tucker Act is limited by the definition of "procurement contract" in the Federal Grant and Cooperative Agreement Act of 1977 ("FGCAA"), 31 U.S.C. §§ 6301-6308 (2006).  It argues that, because OSHA's cooperative agreement met the criteria for using a cooperative agreement under the FGCAA, it cannot be considered a procurement under the Tucker Act.  Def.'s Mot. Dismiss at 9.  In response, Plaintiff argues that the "cooperative agreement" actually was a misnamed procurement contract, and it asserts that the cooperation agreement satisfies the Tucker Act's definition of "procurement."  It argues that the Federal Circuit has broadly defined "procurement" to encompass the cooperative agreement at issue here.

Although this Court's § 1491(b)(1) jurisdiction is limited to protests "in connection with a procurement," the Federal Circuit has defined "procurement" as "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with a contract completion and closeout."  *Resource Conservation Group, LLC v. United States*, 597 F.3d 1238, 1244 (Fed. Cir. 2010) (quoting 41 U.S.C. § 403(2) (2006)).  The Government attempts to limit this definition by arguing that it is ambiguous and that the Court should look to other statutes to resolve that ambiguity.  Those other statutes define "procurement" in a more limited fashion.  The Court finds that the definition set forth by the Federal Circuit is clear and it declines to adopt the extraneous limitations suggested by the Government.

The Court finds that it has bid protest jurisdiction over Plaintiff's complaint.  In reaching that conclusion, the Court recognizes that not all cooperative agreements are procurements under the Tucker Act.  Where an agency, pursuant to a statutory directive, is distributing funds or providing assistance to service providers to ensure a service's availability, it is not conducting a procurement.  However, where an agency has a statutory mandate to provide a service, and the agency decides to use a cooperative agreement to obtain the provision of that service, that agency has engaged in a procurement process under the Tucker Act and this Court has jurisdiction over protests in connection with that process.

Pursuant to statute, OSHA is required to "establish[] and supervis[e]" programs for the education and training of workers.  29 U.S.C. § 670(c) (2006).  In issuing the RFA, OSHA was

2

seeking to obtain the services of third parties in place of OSHA's in implementing the mandate that it establish and supervise training and education programs; OSHA was not seeking to provide funding or assistance to third parties to ensure the availability of training.  Therefore, the Court concludes that the Solicitation was "in connection with" the "process of acquiring property or services" for OSHA and jurisdiction under § 1491(b)(1) is proper.

## I.  Background

On March 29, 2011, OSHA issued the RFA via a Notice in the Federal Register.  76 Fed. Reg. 17451 (Mar. 29, 2011) ("Notice").  The Notice invited interested organizations and current OSHA-authorized training providers to submit applications to be authorized to deliver 10-hour and/or 30-hour OSHA Outreach Training Program courses.  *Id.* at 17452.  Successful applicants would enter into "5-year, nonfinancial cooperative agreements" with OSHA to be approved online-providers of outreach courses.  The agreements were "solely to facilitate the ongoing monitoring and evaluation of" the training provided by the trainers and were not to be considered a "grant or financial assistance instrument."  *Id.*  OSHA listed 29 U.S.C. § 670 as the legal basis for the RFA.

The RFA stated that, to ensure an orderly evaluation, OSHA would use a competitive process to evaluate the applicants that wished to be authorized to provide online training courses.  The RFA stated that although a competitive process was being used, the process was not a procurement action or contract because "no products or services are sought for OSHA's use."  Notice at 17452.  The RFA set forth the information that must be contained in each application, listed the "selection criteria" that OSHA would use to evaluate the applications, and provided notice of a "proposal conference" to provide applicants with more information.  *Id.* at 17452-59.  The RFA stated that OSHA has sought to make the outreach training more readily available to the public by authorizing a number of providers to provide online courses, but that "OSHA has received many more requests for authorization to deliver online outreach training than can feasibly be granted, given the [statutory] requirement that OSHA supervise the training programs it initiates."  *Id.* at 17452.

The cooperative agreements awarded by OSHA specify the conditions a provider must follow in order to maintain its status as an authorized provider.  OSHA must approve any courses before they are offered,[2] and the training provider must have OSHA approve any additions or revisions to course content.  Coop. Agr. at 4 (Def.'s Ex. B).  While OSHA provides no funding to the providers, it authorizes providers to charge fees and sets the maximum fees that each provider may charge.  *Id.* at 6.  OSHA specifies the records a provider must keep, the maintenance period (5 years), and that OSHA can request copies of the records for its own purposes.  *Id.* at 5.  OSHA will issue performance criteria at the beginning of each fiscal year and providers will receive an annual performance appraisal and written report.  *Id.* at 6.  The agreements also specify a variety of reporting and monitoring requirements.

---

[2] Even current providers that were awarded cooperative agreements were not permitted to continue offering existing courses.  Awardees have to ensure that all courses comply with the terms of the cooperative agreement and then get the courses approved by OSHA before they may continue offering online training.  Notice at 17459.

Plaintiff timely and properly submitted applications in response to the Solicitation.  On January 12, 2012, OSHA announced that 10 different providers were being awarded with cooperative agreements.  On January 13, 2012, OSHA notified Plaintiff that it would not receive an award.  The stated basis for the decision was Plaintiff's past performance as an online OSHA training provider.  On March 14, 2012, Plaintiff's personnel discussed Plaintiff's non-selection with OSHA's personnel.

On March 27, 2012, Plaintiff filed its complaint in this Court.  Along with its complaint, Plaintiff filed a motion for a preliminary injunction seeking to enjoin OSHA from taking away Plaintiff's authorization to offer online courses.  The Court held a telephonic hearing with the parties on March 29, 2012.  At the hearing, the Court raised a potential issue with jurisdiction.  The Government concurred, arguing that jurisdiction may not be proper because OSHA's RFA was a non-procurement solicitation.  The Court set an expedited schedule for briefing on the jurisdictional issue.  However, the Court determined that, pending resolution of the jurisdictional issue, it had jurisdiction over the case.  On the merits, the Court found that the balance of the equities weighed in Plaintiff's favor, and it issued a preliminary injunction that extended only until it could render a decision on the jurisdictional issue.

On April 6, 2012, the Government filed its motion to dismiss and Intervenor Clicksafety.com, Inc., filed a brief in support.  Plaintiff filed a response on April 13, 2012, and the Government filed a reply on April 19, 2012.

## II.     Statutory Structure

As a threshold matter, the Court turns to the statutory structure of the FGCAA and the Occupation Safety and Health Act of 1970 ("OSH Act").  The parties' arguments are heavily influenced by their interpretation of the FGCAA, and this Court's decision depends on the precise statutory obligation that OSHA has to provide training courses.

### A.      FGCAA

In the Federal Grant and Cooperative Agreement Act of 1977, Congress prescribes criteria that executive agencies must follow in selecting which legal instrument to use to establish a relationship between the agency and another party.  It addresses multiple instruments, including procurement contracts, grants, and cooperative agreements.  Grants and cooperative agreements collectively are referred to as assistance agreements.  One of the FGCAA's purposes was to promote uniformity in the use of the instruments and to more clearly define the relationships and corresponding responsibilities associated with each instrument.  31 U.S.C. § 6301(2).  Another purpose was to "promote increased discipline in selecting and using procurement contracts, grant agreements, and cooperative agreements, maximize competition in making procurement contracts, and encourage competition in making grants and cooperative agreements."  § 6301(3).

While the FGCAA provides guidance to executive agencies in determining which legal instrument to use when forming a relationship, it does not provide any guidance as to whether an

agency's action is a procurement action.  As the Office of Management and Budget notes in its guidance to the FGCAA, "A determination that a program is principally one of procurement or assistance does not preclude the use of any of the types of instruments when appropriate for a particular transaction."  43 Fed. Reg. 36,863 (Aug. 18, 1978); *see also Thermalon v. United States*, 34 Fed. Cl. 411, 418 (1995) (in finding that the FGCAA did not limit jurisdiction under § 1491(a), the court stated, "Indeed, instead of supporting the conclusion that Congress intended the [FGCAA] to narrow this court's Tucker Act contract jurisdiction, the legislative history of the [FGCAA] demonstrates that Congress intended the definitions and mandates therein to address a very different set of concerns").

According to the FGCAA, executive agencies are to use procurement contracts when "the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government."  § 6303.  On the other hand, cooperative agreements shall be used when "the principal purpose of the relationship is to transfer a thing of value . . . to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring . . . property or services" and "substantial involvement is expected between the executive agency and the . . . recipient . . . ."  § 6305.[3]

It is important for an agency to identify the appropriate funding instrument because procurement contracts are subject to a variety of statutory and regulatory requirements that usually do not apply to assistance agreements.  GAO Office of General Counsel, Principles of Federal Appropriations Law, Vol. 2, Ch. 10 (3d ed. Feb. 2006).  However, sometimes the principal purpose of the funding relationship is not clear.  This commonly can occur when an agency provides assistance to specified recipients by using an intermediary.  *Id.*  An agency is acquiring the intermediary's services for its own direct benefit or use if the agency otherwise would have to use its own staff to provide to beneficiaries the services offered by the intermediary.  *Id.*  In other words, if the agency uses an intermediary to provide a service that the agency is required to provide to beneficiaries, then the services are for the agency's benefit.  However, an agency is obtaining services for a public purpose if the agency is charged with providing support or assistance to intermediaries as opposed to the final beneficiaries.  When an agency supports those intermediaries in providing a service to third parties, an assistance agreement can be the appropriate instrument.  *Id.*  Thus, a key inquiry is whether the agency's focus is on providing a service to the ultimate beneficiaries or on assisting the intermediaries in providing a service.

In 1981 legislation amending FGCAA, a Senate committee report addressed the issue with "intermediary situations."  The report notes that some agencies had trouble determining the proper instrument to use when they were using intermediaries to provide assistance.  The report states:

> [T]hat the product or service produced by the intermediary may benefit another party is irrelevant.  What is important is whether the federal government's

---

[3] The difference between a grant and a cooperative agreement is that a grant should be used where "substantial involvement is *not* expected between the executive agency and the . . . recipient . . . ." 31 U.S.C. § 6304 (emphasis added).

principal purpose is to acquire the intermediary's services, which may happen to take the form of producing a product or carrying out a service that is then delivered to an assistance recipient, or if the government's principal purpose is to assist the intermediary to do the same thing. Where the recipient of an award is not receiving assistance from the federal agency but is merely used to provide a service to another entity which is eligible for assistance, the proper instrument is a procurement contract.

S. REP. NO. 97-180, at *5 (1981), 1982 U.S.C.C.A.N. 3; Pub. L. No. 97-162.

### B.    OSH Act

The Occupation Safety and Health Act of 1970 established OSHA within the Department of Labor to assure safe and healthful working conditions for working men and women by setting and enforcing standards and by providing training, outreach, education and assistance.  Pub. L. 91-596, 84 Stat. 1590 (Dec. 29, 1970); 29 U.S.C. § 651, et seq.  OSHA's duty to provide training and education is governed by 29 U.S.C. § 670.

Section § 670 contains four subsections, each of which requires the government to establish a different type of training and education program.  OSHA established the Outreach Training Program pursuant to subsection (c).  Def.'s Reply at 14.  While subsections (a), (b), and (d) specify the legal instruments that should be used to establish the training programs, subsection (c) does not instruct OSHA as to what sort of legal instrument it should use.  The statute reads, in relevant part, as follows.

(a) . . . The Secretary of Health and Human Services, after consultation with the Secretary [of Labor] . . ., *shall conduct, directly or by grants and contracts* (1) education programs to provide an adequate supply of qualified personnel to carry out the purposes of this chapter, and (2) informational programs on the importance of and proper use of adequate safety and health equipment.

(b) The Secretary [of Labor] *is authorized to conduct directly or by grants and contracts* short term training of personnel engaged in [OSHA-related] work . . . .

(c) The Secretary [of Labor] . . . *shall . . . provide for the establishment and supervision of programs* for the education and training of employers and employees in the recognition, avoidance, and prevention of unsafe or unhealthful working conditions . . . .

(d) Compliance assistance program.  The Secretary [of Labor] *shall establish and support cooperative agreements with the States* under which employers . . . may consult with State personnel with respect to [complying with OSHA standards and taking appropriate actions to establish and maintain a safe workplace.]

29 U.S.C. § 670 (emphasis added).  Aside from the mandate to "establish[] and supervis[e]," § 670(c) provides no guidance on how OSHA is to implement programs for the education and training of workers.

OSHA furthers its mission to provide training through its Directorate of Training and Education ("DTE").  77 Fed. Reg. 22,349 (Apr. 13, 2012).  The DTE provides training through multiple programs, three of which are relevant here: the OSHA Training Institute ("OTI"), OTI Education Centers, and the Outreach Training Program.  The OTI provides training for federal and state compliance officials.  OSHA provides for training for private sector personnel through OTI Education Centers, which are a network of non-profit organizations that OSHA has authorized to deliver occupational safety and health training on behalf of OSHA.  OTI Education Centers offer courses on OSHA standards as well the courses required to become an authorized trainer for the Outreach Training Program.

The Outreach Training Program provides courses that are designed to give workers an overview of the OSHA system, worker rights, and other basic safety and hazard information. Notice at 17452.  The Program's courses are designed to "provide information on worker rights, employer responsibilities, and how to file a complaint on work-related hazards." *Id.*  To ensure that training is widely available, outreach training is provided by independent, OSHA-authorized outreach trainers.  The courses do not teach OSHA standards and OSHA does not require employers or employees to take the courses.  *Id.*  However, some states and other local jurisdictions have mandated the training.  *Id.*

At issue in this case is OSHA's authorization of third parties to provide online outreach courses.

## III.    Discussion

### A.    Subject Matter Jurisdiction

When the Government puts the Court's subject matter jurisdiction in question by moving to dismiss under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), the plaintiff bears the burden to show by a preponderance of the evidence that jurisdiction is proper.  *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).  In this case, the Government has questioned the Court's jurisdiction to hear Plaintiff's protest by asserting that the Court cannot adjudicate protests that do not concern procurement and that OSHA's Solicitation was not a procurement.  In response, Plaintiff argues that, as a legal matter, the Government has defined procurement too narrowly, and as a factual matter, the Solicitation actually was a procurement.

The jurisdiction of the Court of Federal Claims ("CFC") to hear bid protests is governed by the Tucker Act.  Section 1491(b)(1) of the Act provides in part:

[T]he Unite[d] States Court of Federal Claims . . . shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed

award or the award of a contract or any alleged violation of statute or regulation
*in connection with a procurement or a proposed procurement*.

28 U.S.C. § 1491(b)(1) (emphasis added).  The Tucker Act does not define the term
"procurement."  *Resource Conservation*, 597 F.3d at 1244.  In determining the scope of §
1491(b)(1), the Federal Circuit has adopted the definition of "procurement" contained in 41
U.S.C. § 403(2), which has been reorganized into 41 U.S.C. § 111.[4]  *Distributed Solutions, Inc.
v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008).  Section 111 provides that the term
"'procurement' includes all stages of the process of acquiring property or services, beginning
with the process for determining a need for property or services and ending with a contract
completion and closeout."

Although this Court's § 1491(b)(1) jurisdiction covers "the full range of procurement
protest cases," § 1491(b)(1) is limited to protests "in connection with a procurement or a
proposed procurement."  *Resource Conservation*, 597 F.3d at 1243-44 (finding that § 1491(b)(1)
"in its entirety is exclusively concerned with procurement solicitations and contracts").
Therefore, the CFC does not have jurisdiction over non-procurement bid protests under §
1491(b)(1).  *Resource Conservation*, 597 F.3d at 1245-46.

Although this Court's bid protest jurisdiction is limited to the procurement context, the
phrase "'in connection with' is very sweeping in scope."  *Distributed Solutions*, 539 F.3d at
1345.  Jurisdiction will be proper if the protest "involves a connection with any stage of the
federal contracting acquisition process, including 'the process for determining a need for
property or services.'"  *Id.* at 1346.  Moreover, "the statute does not require an actual
procurement."  *Id.*  The CFC has jurisdiction over "proposed procurements" and it can adjudicate
pre-procurement decisions.  *Id.*

To appreciate the scope of the phrase "in connection with a procurement or proposed
procurement," it is helpful to look at several cases where courts have used § 111 to construe the
scope of the Tucker Act.  In *Distributed Solutions*, the protestors challenged the agency's
decision to acquire software through an existing contractor instead of through a procurement.
539 F.3d at 1343.  The agency had issued an RFI for the software, and many companies
submitted responses.  Based on the proposals, the agency formulated the details of its need for
software, and then it tasked an existing general contractor with procuring the software via a
subcontract.  The protestors asserted that, by issuing the RFI, the agency started a procurement
process and it wrongly used a general contractor to circumvent the procurement laws instead of
following through with the procurement.  *Id.* at 1344.  The Federal Circuit agreed, finding the
RFI was the beginning of the process for determining a need for the software.  It found that §
1491(b)(1) did not require an actual procurement and it applied to these kinds of pre-
procurement decisions.  *Id.* at 1346.

---

[4] The official version of 41 U.S.C. § 111 has not been printed, but the unofficial version is
available at 41 U.S.C.A. § 111 (West 2012).  *See also* Office of the Law Revision Counsel, U.S. House of
Representatives, http://uscode.house.gov/lawrevisioncounsel.shtml.

In *Resource Conservation*, the Navy wanted to lease a property that it owned but no longer was using. 597 F.3d at 1240. The Navy issued a request for applications to lease the property, and several potential lessees submitted applications. After the Navy selected a lessee, a disappointed applicant filed a protest challenging the Navy's selection process. The Federal Circuit, relying on § 111, found that "the process involved in soliciting lessees for government-owned property cannot be characterized as a 'process of acquiring property or services.'" *Resource Conservation*, 597 F.3d at 1244. It held that the Tucker Act does not apply to non-procurement protests. Similarly, the Federal Circuit has found, albeit in an unpublished opinion, that the government's sale of property is not part of a process of acquiring property or services. *Creation Upgrades, Inc. v. United States*, 417 Fed. Appx. 957, 959 (Fed. Cir. 2011) (finding no meaningful distinction between the lease and sale of government property).

Courts of other circuits also have considered the scope of § 1491(b)(1). In *Fisher-Cal Industries, Inc. v. United States*, -- F.Supp.2d --, 2012 WL 914674 (D.D.C. Mar. 19, 2012), the district court for the District of Columbia found that an agency's decision to insource a contract, instead of using an outside contractor, was "in connection with" a procurement and therefore within the CFC's exclusive jurisdiction.[5] In that case, the plaintiff had asserted that the government's decision to insource services could not be a procurement because it was "an act to not acquire." *Id.* at *4. The district judge disagreed, stating that "[a]s numerous other courts, including the Fifth, Eleventh, and Federal Circuits, have noted, insourcing necessarily involves 'determining a need for property or services' and whether there was a need to perform such functions through private contractors." *Id.* (quoting *Rothe Dev., Inc. v. U.S. Dep't of Defense*, 666 F.3d 336, 339 (5th Cir. 2011)). The court also distinguished the case from *Resource Conservation* stating that the Federal Circuit's "discussion of procurement was limited to the factual circumstances of the case" where the government was "deciding whether to sell or lease property [which] is the opposite of acquiring property . . . ." *Fisher-Cal*, 2012 WL 914674 at *5.

Other courts that have considered challenges to agency insourcing decisions have reached substantially the same conclusions based on § 1491(b)(1). *See Rothe Dev.*, 666 F.3d at 339 (Fifth Circuit holding that it lacked jurisdiction over insourcing claim because "the process for *determining a need for services*" necessarily included "the choice to *refrain* from obtaining outside services" which was under the jurisdiction of the Tucker Act (emphasis in original)); *Vero Tech. Support, Inc. v. U.S. Dep't of Defense*, 437 Fed. Appx. 766 (11th Cir. 2011), *aff'g*, 733 F.Supp.2d 1336 (S.D. Fla. 2010) (affirming district court's decision that it lacked jurisdiction over challenge to insourcing decision because the decision to insource "involves the process of 'determining a need for property or services,' . . . [and] that decision occurs 'in connection with a procurement or a proposed procurement' under the Tucker Act"); *see also Santa Barbara Applied Research, Inc. v. United States*, 98 Fed. Cl. 536, 542-43 (2011) (finding that it had § 1491(b)(1) jurisdiction over insourcing decision).

_____

[5] Because the claim was under the CFC's Tucker Act jurisdiction, the district court lacked jurisdiction under the Administrative Procedure Act, which provides for judicial review of agency actions only if "there is no other adequate remedy in a court . . . ." *Fisher-Cal*, 2012 WL 914674 at *6 (quoting 5 U.S.C. § 704).

In sum, so long as a claim is "in connection with" any stage "of the process of acquiring property or services," jurisdiction in this Court is proper.

## B.      OSHA's Solicitation Was a Procurement Action under the Tucker Act

Plaintiff argues that the agreement at issue "is a procurement contract in a cooperative agreement's clothing." Pl.'s Resp. at 2. It asserts that the cooperative agreement satisfies the definition of procurement as enunciated by the Federal Circuit in *Resource Conservation* and *Distributed Solutions*. According to Plaintiff, OSHA has a statutory obligation to provide training, and by soliciting competitive bids to outsource one of its jobs, OSHA has engaged in a procurement process. Plaintiff asserts that the cooperative agreement is a contract[6] and OSHA receives a direct benefit[7] by tasking third parties with conducting training that OSHA otherwise would have to conduct. OSHA gives awardees authorization to provide courses and to charge fees, and in return, OSHA receives tailor-made training courses distributed by online providers that serve as "contract workers at the direction and will of OSHA." Pl.'s Resp. at 8.

Plaintiff distinguishes the Federal Circuit's decision in *Resource Conservation* by noting that the court in that case held that the process of soliciting lessees for government-owned property cannot be characterized as a "process of acquiring property or services" and that this case is much different because OSHA is seeking third parties to provide OSHA-authorized training in furtherance of OSHA's statutory mission. Pl.'s Resp. at 10-11 (quoting 597 F.3d at 1244). It argues that the Court should look at the process of what OSHA was trying to do and not at the label that OSHA applied to it.[8]

The Government argues that the Solicitation was not part of a procurement process because the agreements at issue satisfy the criteria for using a cooperative agreement under FGCAA § 6305. The Government argues that the cooperative agreements cannot be "procurement contracts" because the Government is providing no funding of any kind, it is not acquiring goods or services by means of purchase, lease, or barter, and the plain language of the RFA indicates that OSHA did not intend to engage in a procurement action. Def.'s Reply at 9. The Government argues that § 670(c) requires OSHA to "'provide for the establishment and supervision of *programs* for the education and *training* of employers and employees.'" Def.'s Reply at 14 (quoting § 670(c)) (emphasis in the original). "To authorize an entity to perform a service to the public is *not* the same as to award a procurement contract." Def.'s Reply at 11 (emphasis in original).

First, the Court agrees that the label used by OSHA is not dispositive and that the Court should look at the actual process that was used and the need that OSHA was trying to satisfy. As

---

[6] The Government admits that the cooperative agreements are contracts but argues that the contracts are not procurement contracts. Def.'s Reply, at 10 n.2.

[7] In arguing their respective positions, both parties conflate the definitions contained in the FGCAA with the definition of procurement under the Tucker Act and 41 U.S.C. § 111.

[8] The Government agrees that "simply categorizing a process as 'non-procurement' does not make it so." Def.'s Reply at 8.

discussed, the RFA was issued under § 670, and in providing the outreach courses, OSHA was attempting to obtain services from third parties to satisfy its duty under § 670(c).

Section 670(c) provides that OSHA shall "provide for the establishment and supervision of programs for the education and training of employers and employees." Whereas subsections (a) and (b) state that OSHA shall provide training "directly or by contracts and grants" and subsection (d) provides that OSHA shall use cooperative agreements, subsection (c) leaves OSHA flexibility in how to implement the training program.[9] OSHA could have chosen to provide the training itself, it could have hired a contractor to provide the services, or it could have used an assistance agreement. In determining how to comply with subsection (c), OSHA had to determine whether it would provide the training itself or whether it would seek to obtain the services of a third party (or parties).

Apparently, OSHA decided that it did not want to provide the training itself, and instead, it decided it would design the program and then enlist third parties to provide the actual training. It is not clear from the record how OSHA originally authorized third parties to provide training. What is clear is that OSHA became unhappy with the authorization scheme and determined that it needed a more formal relationship with the providers in order to properly supervise the training program. To ensure that OSHA could effectively "monitor[] and evaluate[]" training providers, OSHA decided that it would enter into cooperative agreements with the providers. Notice at 17452.

The cooperative agreements awarded by OSHA are somewhat different from ordinary assistance agreements. OSHA expressly disclaims that the agreements are a "grant or financial assistance agreement." Notice at 17452. Instead of being a vehicle for OSHA to provide assistance to the third party vendors, the agreements are designed to ensure that OSHA retains control over the courses. The cooperative agreements state that OSHA approval is required for any changes to course material, and they are very detailed in numerous other respects, specifying the prices that vendors may set, record keeping standards, and other requirements. The benefit received by the third party vendors is not OSHA assistance in designing courses, but the authorization to charge fees. While OSHA is not paying course providers for their services, OSHA provides them with authorization to provide approved courses and permission to charge a fee to students.

That the cooperative agreements here differ from ordinary assistance agreements is not surprising because the statutory mandate that OSHA is carrying out is different from that

---

[9] For the purposes of this decision, the Court assumes that § 670(c)'s silence leaves OSHA with the flexibility to use any type of legal instrument and that OSHA properly chose to use a cooperative agreement. Although Plaintiff argues that, based on the explicit statutory instructions of what instruments to use, OSHA cannot satisfy its duty under § 670(c) to provide training by using a cooperative agreement, Plaintiff has not established that its interpretation of § 670(c) is proper. *See* Pl.'s Resp. at 3-4. Were the Court to find that OSHA were not statutorily authorized to use a cooperative agreement, it would be forced to find that the RFA process was invalid and have OSHA conduct a procurement pursuant to the requirements of the FAR and other Acquisition regulations. *See Distributed Solutions*, 539 F.3d at 1346. Because the Court concludes that the cooperative agreement is a procurement under the Tucker Act, it can proceed to the merits of Plaintiff's claim without invalidating the entire RFA.

typically associated with assistance agreements.  In discussing the purpose of cooperative agreements, the Government cites to several cases.  One case is *Rick's Mushroom Service, Inc. v. United States*, 521 F.3d 1338 (Fed. Cir. 2008),[10] where the Federal Circuit affirmed the finding that a cost-sharing agreement issued by the Department of Agriculture was not a procurement contract.  The plaintiff in that case constructed a waste transfer facility in accordance with government specifications in return for cost-share payments from the government.  The statute at issue in that case was 16 U.S.C. § 1003, which provided that "In order to assist local organizations . . . , [the agency] is authorized . . . to enter into agreements with landowners . . . providing for changes in . . . land uses and . . . soil and water conservation practices . . . .  In return . . . [the agency] shall agree to share the costs of carrying out those practices . . . ."

Another case is *R&D Dynamics Corp. v. United States*, 80 Fed. Cl. 715 (2007), *aff'd*, 309 Fed. Appx. 388 (Fed. Cir. 2009) (per curiam with no opinion).  In that case the plaintiff argued that grants issued by the Army pursuant to the Small Business Innovation Research ("SBIR") program constituted a procurement because the government was procuring research and development services.  *Id.* at 719.  The CFC determined that it did not have jurisdiction because the grants, which were issued pursuant to 15 U.S.C. § 638, were not part of a procurement process.  The purpose of the SBIR was "to stimulate technological development" via small businesses and to "foster and encourage participation by minority and disadvantaged persons." *Id.* at 716 (quoting § 638(a)).  The implementing statute states that the purpose of SBIR programs is to provide "assistance to small-business concerns to enable them to undertake and to obtain the benefits of research and development . . . ."  *R&D Dynamics*, 80 Fed. Cl. at 720 (quoting § 638(a)).

The enabling statutes in *Rick's Mushroom Service* and *R&D Dynamics* are very different from the one in this case, where OSHA's role is not merely to provide assistance to independent trainers or to foster and encourage the development of a training program.  Under 29 U.S.C. § 670(c), OSHA is required to establish and supervise a training program.  OSHA chose to design the program and then use cooperative agreements to obtain the services of third-party training providers to further its statutory mandate.  OSHA was not tasked with supporting training programs or stimulating the wider availability of training programs.  The language of § 670(c) is different even than § 670(d), which provides that OSHA shall "establish and *support* cooperative agreements with the States."

This Court has jurisdiction over a bid protest where the challenger asserts that an impropriety occurred "in connection with a procurement or a proposed procurement," where the term "'procurement' includes all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with a contract completion and closeout."  Here, it is clear that OSHA determined that it needed to enlist the services of a third party in order to provide an education and training program.  OSHA issued a solicitation and awarded "cooperative agreements," which provided that OSHA would have significant control over the course providers and course content, and in exchange, OSHA gave providers permission to offer OSHA-authorized courses and to charge fees for those

---

[10] As the Government notes, this case was decided under the Contracts Disputes Act, 41 U.S.C. § 609, and therefore, is not binding in interpreting the Tucker Act.

courses.  Whatever the agreements are called, the Court finds that OSHA was using the agreements to obtain the services of third parties.  Therefore, the Court finds that OSHA was conducting a "procurement" under the terminology of the Tucker Act, and this Court has jurisdiction over Plaintiff's bid protest that is in connection with that procurement.

**C.     The Definition of "Procurement" under the Tucker Act Is Not As Narrow As the Government Claims**

Despite the clarity in the law on the scope of the term "procurement" in the Tucker Act, the Government argues that the definition of "procurement" actually is narrower than the definition in § 111.  Section 111 defines procurement as "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with a contract completion and closeout."  As explained below, the Government's arguments are unpersuasive, and the Court declines the Government's invitation to needlessly graft extraneous limitations onto the Tucker Act.

**1.     "Procurement" Is Not Limited to "Acquisitions" Made Using Appropriated Funds**

Although the Government recognizes that the Federal Circuit has adopted the definition of "procurement" contained in 41 U.S.C. § 111 (formerly § 403(2)), it argues that the § 111 definition is ambiguous because it does not define the word "acquiring" (the "acquiring of property or services").  Even though § 111 is contained in *Division A* of Title 41, Subtitle I, the Government asserts that the word "acquiring" should be defined by 41 U.S.C. § 131 (formerly § 403(16)), which reads: "In *division B* [of this subtitle], the term 'acquisition' means the process of acquiring, with appropriated amounts, by contract for purchase or lease, property or services . . . that support the missions and goals of an executive agency."  *See* Def.'s Reply at 5 (emphasis added).  The Government also asserts that § 111 should be interpreted in light of the Federal Acquisition Regulations ("FAR").  The FAR defines both acquisition and procurement as the "acquisition . . . of goods or services . . . from non-Federal sources by a Federal agency using appropriated funds."  Def.'s Mot. Dismiss at 10 (quoting 48 C.F.R. §§ 2.101(b)(2), 3.104-1(5)).

In response, Plaintiff argues that the definition of procurement is not as narrow as the Government asserts.  Plaintiff asserts that the definition of "procurement" is the one contained in § 111 and the Government wants to adopt a different definition because it does not like the § 111 definition.  Pl.'s Resp. at 10.  Plaintiff argues that no court has adopted a definition as limited as the Government's.  It argues that, based on § 1491's legislative history, procurement is not limited to the Government's acquisition of supplies or services, but rather is a "more general reference to the process by which the Government endeavors to fulfill any of its needs through the mechanics of a solicitation and contract award."  Pl.'s Resp. at 11 (quoting *Catholic Univ. of Am. v. United States*, 49 Fed. Cl. 795, 800 (2001)).

The Court concludes that § 111 is not ambiguous because the word "acquiring" is used in its ordinary sense and not in the technical or legal sense.  This is bolstered by the fact that § 131 similarly uses the word "acquiring" to define "acquisition," and the Court must presume that Congress did not intend make that definition circular and meaningless.  Moreover, had Congress

intended for the "with appropriated funds" clause to apply to "procurement," it would had included those words in § 403(2) or it would have added those words when it reorganized it into § 111.  When Congress reorganized Title 41, it stated that "This bill is intended to restate existing law without substantive change."  H.R. REP. NO. 11-42, Pub. L. No. 111-350 (Mar. 23, 2009).  The definition of acquisition in § 131 explicitly provides that it only applies to Division B and therefore it does not apply to § 111 in Division A.  Because this does not represent a change in the law, the definition of "procurement" in former § 403(2) is not limited by the definition of "acquisition" in former § 403(16).

Although the Government argues § 111 should be restricted to the definition of "acquisition" in § 131, under normal standards of statutory construction, the presence of the phrase "with appropriated funds" in § 131 but not in § 111 militates against reading the requirement into § 111.  The term "procurement" therefore is broader than "acquisition."  Nor is it proper to import the FAR definition to narrow the statutory definition.  Therefore, the Court rejects the Government's invitation to limit the scope of the Tucker Act to bid protests where an agency is using appropriated funds.

> 2.      **Whether the Agreement Was a Cooperative Agreement under the FGCAA Is Irrelevant Because OSHA Was Seeking to Obtain the Services of a Third Party**

Relying on the definitions in § 6303 and § 6305 of the FGCAA, the Government argues that the RFA cannot be a procurement because the agreements at issue satisfy the criteria for using a cooperative agreement.  The Government asserts that the primary purpose of OSHA's solicitation was "to carry out a public purpose of support or stimulation" of promoting occupational and workplace safety and not to acquire property, goods, or services.  Def.'s Mot. Dismiss at 12.  The Government argues that "promoting occupational and workplace safety through [the] Outreach Training Program" is a public purpose that OSHA has sought to "support or stimulate" by providing authorization under the cooperative agreements.  Def.'s Reply at 11. The Government argues that under § 670(c) OSHA was required only to "'provide for the establishment and supervision of *programs* for the education and *training* of employers and employees.'"  Def.'s Reply at 14 (quoting § 670(c)) (emphasis in the original).  It argues that the award of a cooperative agreement cannot be a procurement because the Government is providing no funding and it is not acquiring goods or services by means of purchase, lease, or barter. Def.'s Mot. Dismiss at 11.

Plaintiff argues that, even under the FGCAA, the agreement at issue "is a cooperative agreement in name only and essentially is a procurement contract . . . ."  Pl.'s Resp. at 2. According to Plaintiff, § 670 requires OSHA to provide training and OSHA has engaged in a procurement process by outsourcing one of its jobs.  Plaintiff asserts OSHA is receiving a direct benefit by tasking third parties with conducting training that OSHA otherwise would have to conduct.  It also argues that the purpose of OSHA's "cooperative agreement" was more consistent with a procurement contract under § 6303 than a cooperative agreement under § 6305. It further argues that the agreement was a procurement because Congress did not authorize OSHA to use cooperative agreements in performing its duty to provide training.  Pl.'s Resp. at 14.

Based on both the content and the purpose of the RFA, Plaintiff asserts that the RFA was part of a procurement process. Although OSHA is not paying awardees, the grant of authorization gives awardees access to a significant revenue stream. In return for giving awardees authorization to provide courses, OSHA receives training courses that are designed and distributed according to OSHA's detailed instructions. Pl.'s Resp. at 8. Plaintiff points to OSHA's requirements for course content and the method of delivery, the schedule of maximum fees that may be charged, and the high level of OSHA's involvement in the course design and delivery process, and asserts that OSHA's involvement goes beyond an assistance agreement. Plaintiff essentially is arguing that OSHA's grant of authorization in exchange for "tailor-made training courses" is a barter agreement, though Plaintiff does not use the word "barter."

Although the parties devoted a substantial part of their briefs to the FGCAA, that Act is mostly irrelevant to this Court's jurisdiction under § 1491(b)(1). As discussed above, the FGCAA is directed to a different set of concerns than the Tucker Act. The FGCAA sets criteria that an agency should evaluate when deciding which legal instrument best represents the relationship between two parties, while the Tucker Act provides for jurisdiction over a procurement or a proposed procurement, which encompasses the entire process of obtaining property or services from a third party. *See Thermalon*, 34 Fed. Cl. at 418. The Court, therefore, finds that the descriptions of procurement contracts and cooperative agreements contained in 31 U.S.C. § 6303 and § 6305 do not narrow the definition of procurement in the Tucker Act or 41 U.S.C. § 111.

The Government essentially is arguing that, if an agreement can properly be called a cooperative agreement under § 6305, then that agreement cannot be "in connection with" a procurement or proposed procurement. The Court rejects this argument because the definition of "procurement" under the Tucker Act is broader than the definition of "procurement contract" in the FGCAA. The result of this seems somewhat anomalous because an agency can engage in a procurement process even though it is using a cooperative agreement, instead of a procurement contract, to memorialize the parties' agreement. To be sure, where the primary purpose of a cooperative agreement is to assist a third party in performing a public service, that agreement most likely is outside of the Tucker Act. But where, as here, an agency enters into a cooperative agreement to obtain the services of a third party, that transaction is part of the procurement process.

In this case, it is not clear at this early stage whether OSHA properly used a cooperative agreement or whether it should have used a procurement contract. For the purposes of jurisdiction, however, it is irrelevant because, even if OSHA properly entered into cooperative agreements with the awardees, OSHA was seeking to obtain the services of the awardees. The OSH Act left OSHA with flexibility on how to establish a training program, and OSHA could have provided the training directly or it could have hired a contractor to provide the service for it. Providing the program's training course requirements to an intermediary and then supervising that intermediary's implementation of the courses is one reasonable way for OSHA to provide the service. But in doing so, OSHA made the decision to issue a solicitation, select awardees, and then enter into cooperative agreements with awardees which was for the purpose of

15

acquiring the service of a third party to conduct a training program, and therefore, protests of those actions are within this Court's jurisdiction.

The Government also argues that, even if OSHA is not authorized to enter into cooperative agreements, that does not, by default, transform the cooperative agreement into a procurement contract. Def.'s Reply at 13. The Government argues that, even if OSHA should have conducted a procurement, Plaintiff has waived that argument because it was obligated to make that objection before the closing date for submission of applications. Def.'s Reply at 13 (citing *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007)). As the Court just explained, that the agreement was a cooperative agreement under the FGCAA does not mean that it could not be "in connection with a procurement" under a completely different statutory scheme. Moreover, if OSHA violated the law when making the pre-procurement decision to use a cooperative agreement instead of a procurement contract, a protest of that action is in connection with a proposed procurement under *Distributed Solutions*, 539 F.3d at 1346. *See also Rothe Dev.*, 666 F.3d at 339; *Santa Barbara Applied Research*, 98 Fed. Cl. at 542-43. Whether that argument has been waived goes to a determination on the merits, rather than on jurisdiction.

Plaintiff also argues that, based on the language of the RFA, the RFA was a procurement. The RFA provided selection criteria, it provided notice of a "proposal conference," selectees and non-selectees were notified of the decision, it set the fee schedule for classes, and reserved to OSHA many design and standards rights. Pl.'s Resp. at 16-17. The Government admits that OSHA's solicitation involved elements of competition, but states that agencies are encouraged to use competition in awarding grants and cooperative agreements. Def.'s Mot. Dismiss at 11. The Court agrees with the Government on this point. The FGCAA shows that agencies are encouraged to use competitive processes when awarding assistance agreements. Therefore, an agency's use of a competitive process alone does not make a solicitation a procurement action.

## IV.   Conclusion

For the reasons set forth above, this Court has bid protest jurisdiction over Plaintiff's challenge to the Solicitation. Accordingly, the Government's Motion to Dismiss for Lack of Jurisdiction is **DENIED**. The Preliminary Injunction shall remain in effect through April 30, 2012. The Court will discuss the injunction with the parties in a status conference scheduled for April 30, 2012.

s/ Edward J. Damich
EDWARD J. DAMICH
Judge