# In the United States Court of Federal Claims

No. 12-197 C
(Filed: August 3, 2012)
(Originally Filed: July 13, 2012)[1]

```
*************************************
                                    *
360TRAINING.COM, INC.,              *
                                    *
                Plaintiff,          *
                                    *
        v.                          *
                                    *
THE UNITED STATES,                  *
                                    *
                Defendant,          *
                                    *
        and                         *
                                    *
CLICKSAFETY.COM, INC.,              *
                                    *
                Defendant/Intervenor. *
                                    *
*************************************
```

*Carl Alexander Gebo*, Gordon & Rees LLP, Atlanta, GA, for Plaintiff.

*Joseph Alan Pixley*, Trial Attorney, Civil Division, United States Department of Justice, Washington, DC, for Defendant; with whom was *Robert W. Swain*, Office of the Solicitor, Occupational Safety and Health Division, U.S. Department of Labor.

*Daniel James Kelly*, McCarter & English, LLP, Boston, MA, for Defendant/Intervenor.

_____

**OPINION**

_____

**DAMICH**, Judge:

_____

[1] This opinion originally was issued under seal on July 13, 2012, pending a determination among the parties whether to propose redactions of competition-sensitive, proprietary, confidential, or otherwise protected information. The Court has accepted the parties' proposed redactions, which are indicated herein in the format of three consecutive asterisks within brackets ("[***]"). The Court also has made minor edits to the discussion section of the opinion.

Plaintiff 360Training.com, Inc., ("360") filed this post-award bid protest on March 27, 2012.  360 had submitted several applications in response to a "Request for Applications" ("RFA" or "Solicitation") issued by the Occupational Safety and Health Administration ("OSHA") of the United States Department of Labor.  OSHA was seeking to authorize qualified vendors to be online providers of OSHA Outreach Training Program courses ("outreach courses").  Prior to the RFA, 360 was an authorized online provider of several outreach courses.  In response to the RFA, 360 submitted 5 applications, one for each outreach course it wished to provide.  On January 12, 2012, OSHA announced that 10 different providers were selected for an award.  360 was not selected and this bid protest followed.

Currently pending before the Court are the parties' cross-motions for judgment on the administrative record and 360's motion to supplement the administrative record.  360 alleges that OSHA's decision not to select any of 360's course applications lacked a rational basis because the application evaluation process OSHA actually used was different than the process disclosed in the RFA.  360 requests a permanent injunction that would either allow it to continue offering online courses, require OSHA to reevaluate its applications, or require OSHA to cancel the awards and rebid the competition.  To be successful on the merits, 360 must show that OSHA's decision lacked a rational basis and that it was prejudiced by OSHA's decision by showing both a significant error and that it had a substantial chance of receiving an award but for that error.

The Court finds that OSHA adopted an evaluation process that materially differed from the process disclosed in the RFA and that OSHA's final evaluations and ratings are inconsistent with the contemporaneous documentation in the administrative record.  In its actual evaluation of 360's applications, OSHA imposed an undisclosed eligibility requirement—the applicant's probationary status as a provider of online outreach courses—and OSHA improperly determined that 360 was ineligible to apply.  The Court also finds that OSHA's decision prejudiced 360 because, had OSHA evaluated all the applications consistent with the evaluation process and selection criteria disclosed in the RFA, 360 stood a substantial chance of award.  Therefore, 360 has established that it is entitled to relief.

## I.  Background

### A.  Procedural History

On March 27, 2012, Plaintiff filed its complaint in this Court.  Along with its complaint, Plaintiff filed a motion for a preliminary injunction seeking to preserve the status quo by enjoining OSHA from issuing contracts to the awardees.  ClickSafety.com, Inc., one of the 10 awardees, intervened.  After a hearing, the Court determined that, instead of enjoining OSHA from making any awards, the more equitable remedy was to permit OSHA to proceed with the awards but adding 360 as an 11th awardee.  Therefore, the Court issued a preliminary injunction permitting OSHA to make the awards but enjoining OSHA to treat 360 as an awardee as well.

On April 6, 2012, the Government filed a motion to dismiss for lack of subject matter jurisdiction because the contract OSHA entered into with awardees was labeled a "cooperative agreement" and not a "procurement contract."  On April 26, 2012, this Court found that in

issuing the RFA, OSHA was seeking to obtain the services of third parties in place of OSHA's in implementing the mandate that it establish and supervise training and education programs, *see* 29 U.S.C. § 670(c) (2006); OSHA was not seeking to provide funding or assistance to third parties to ensure the availability of training.  The Court noted the agreements were intended to give OSHA the ability to exercise tight control over course content and delivery, as well as the business practices of the providers, so that OSHA could ensure that the training met its standards.  Therefore, the Court concluded that the Solicitation was "in connection with" the "process of acquiring property or services" for OSHA and jurisdiction under § 1491(b)(1) was proper.  *360Training.com v. United States*, Docket No. 12-197, -- Fed. Cl. --, 2012 WL 1655722 (Apr. 26, 2012).  After the Court denied the motion to dismiss, it extended the preliminary injunction through a decision on the merits.[2]

On May 14, 2012, 360 filed its Motion for Judgment on the Administrative Record ("Pl.'s Mot. JAR").  Simultaneously, it filed its First Motion to Supplement the Administrative Record.  On May 24, 2012, the Government filed a Cross-Motion for Judgment on the Administrative Record ("Def.'s Mot. JAR") and also a Response to the Motion to Supplement the Administrative Record.  ClickSafety filed a brief in support of the Government's Cross-Motion.[3]  On May 29, 2012, 360 filed a Response and Reply, and on June 1, 2012, it filed an Amended Response and Reply ("Pl.'s Reply") with leave of the Court.  On June 4, 2012, the Government filed a Reply ("Def.'s Reply") and ClickSafety filed a brief in support.  On June 7, 2012, 360 filed a Second Motion to Supplement the Administrative Record, and on June 11, 2012, the Government filed a response.

### B.  Facts

Additional facts are set forth in this Court's April 26, 2012 decision denying the Government's motion to dismiss for lack of jurisdiction.  Below, the Court provides some background information on the Outreach Training Program, followed by an overview of the Solicitation.  Then, the Court discusses 360's past performance as a provider of online outreach courses.

### 1.  The Outreach Training Program

OSHA established the Outreach Training Program pursuant to § 670(c).  OSHA furthers its mission to provide training through its Directorate of Training and Education ("DTE").  DTE

---

[2] The Court had intended to issue this decision in less than one month, but that timeline was delayed by the transfer of a bid protest related to the same RFA, *American Safety Council v. United States*, Docket No. 12-355.  That case initially was before this Judge, *see* Docket No. 12-210, but the plaintiff voluntarily dismissed and refiled its case in the District for the District of Columbia.  According to American Safety Council, on May 25, 2012, Judge Howell "*sua sponte* raised the issue of subject matter jurisdiction and expressed the view that the Court of Federal Claims may have the better jurisdictional basis to hear [this] protest."  *American Safety Council*, Docket No. 12-355, Compl. ¶ 21.  The case was transferred back to this Court under 28 U.S.C. § 1631.

[3] ClickSafety does not raise any arguments not made by the Government.  Therefore, the Court does not separately address ClickSafety's arguments in this decision.

is responsible for conducting and administering many of OSHA's training programs, including the Outreach Training Program.  OSHA provides training through multiple programs, two of which are relevant here: OSHA Training Institute Education Centers ("OTIECs") and the Outreach Training Program.  OTIECs are a network of non-profit organizations that OSHA has authorized to deliver occupational safety and health training on behalf of OSHA.  OTIECs offer courses on OSHA standards as well as the courses required to become an authorized trainer for the Outreach Training Program.

The Outreach Training Program provides courses that are designed to give workers an overview of the OSHA system, worker rights, and other basic safety and hazard information. Administrative Record ("AR") 1.  Through the program, "workers may attend 10- and 30-hour classes in construction, general industry, and maritime, and 2-day classes for disaster site workers."  AR 55.  OSHA does not require workers to attend outreach training classes, but the classes are required by certain states and by "some employers, unions, organizations, and other jurisdictions."  AR 1.  In jurisdictions where the training is required, workers typically cannot gain access to job sites unless they first show their OSHA Outreach Training course completion card, called a "DOL card."  *See* Intvr.'s Mot. Recons. PI, May 4, 2012, at 7-8; *Id.* at Appx. A ¶11 (Brian Tonry Aff.).

OSHA does not directly provide outreach courses to workers.  The outreach courses are given by independent OSHA-authorized trainers, who are individuals who have taken and passed a series of courses on becoming an outreach trainer and have met other requirements.  Each trainer's authorization status is maintained by the Authorizing Training Organization ("ATO"), which typically is the OTIEC that trained the trainer.  *See* AR 222 (Outreach Training Program Requirements).[4]  Prior to 2001, authorized trainers could conduct only in-person outreach training of workers.  *See* AR 229.  A worker who completes an outreach course receives an "OSHA course completion card from the authorized trainer who conducted the training."  *Id.* The trainer does not create the card; the trainer submits an application to the ATO, which then issues a card to the trainer for distribution to the worker.  *See* AR 230-31.

In 2001, OSHA began to authorize organizations to partner with authorized trainers to develop online outreach courses to be delivered via the Internet.  AR 56.  Although organizations were authorized to provide the courses, an OSHA-authorized trainer was responsible for administering the course.  By 2011, OSHA had accepted for online delivery 35 Outreach Training courses, which were provided by 11 different organizations.  AR 56.

Due to significant increases in requests for online training, OSHA began to experience "significant challenges" regarding "quality control" of its program.  AR 56.  The agency "did not have dedicated resources to review and approve these programs," and applicants were "growing increasingly unhappy" regarding the time it took to process applications.  *Id.*  OSHA noted that reselling agreements, where the authorized training provider contracted with other websites to have those websites resell the provider's courses, had been especially problematic for OSHA and the general public.  AR 56-57.

---

[4] The Outreach Training Program Requirements also are available on OSHA's website at http://www.osha.gov/dte/outreach/program_requirements.html (last visited: July 12, 2012).

In response to these problems, "OSHA developed and implemented a formalized plan for programs to be evaluated and selected through a competitive process." *Id*. According to OSHA, "[t]his plan included the development of robust technical specifications and control measures, including random user verification, a high level of interactivity, and testing and evaluation methods to ensure high quality programs for all participants." *Id*. The new plan was to result in the "[m]ore efficient use of OSHA resources" and the "[a]bility of the program to withstand outside scrutiny." AR 185. In the new plan, OSHA prohibited providers from using resellers. The formalized plan resulted in the RFA at issue.

### 2. The RFA and Award Process

On March 29, 2011, OSHA issued the RFA via a Notice in the Federal Register. AR 1; *see also* 76 Fed. Reg. 17451 (Mar. 29, 2011). The RFA invited interested organizations to submit applications to be authorized to deliver OSHA Outreach Training Program courses. AR 2. Successful applicants would enter into "5-year, nonfinancial cooperative agreements" with OSHA to become authorized online-providers of outreach courses.[5] *Id*. The RFA stated that OSHA did not have a predetermined number of organizations that would be selected, and the RFA provided that OSHA would determine the number of selectees based on the quality of the applications it received. AR 2. All organizations seeking to offer online Outreach Training Program courses, including then-current authorized online training providers, were required to submit an application in order to be considered. AR 1.

The RFA set forth eligibility requirements, and it listed the selection criteria and evaluation process that OSHA would use to evaluate the applications and select awardees. AR 2-11. The RFA specified 4 requirements that an organization had to satisfy to be eligible to apply, and it disclosed that OSHA would evaluate applicants based upon 7 selection criteria. AR 9. For each selection criterion, the RFA listed several subcriteria. The RFA explained that OSHA would review course applications "against the criteria listed in this notice to determine which applicants best meet the stated requirements." AR 11.

In response to the Solicitation, OSHA received 162 applications from 47 different organizations. AR 57. To process the volume of applications, OSHA decided to conduct a two-level review process. This process cannot be found—at least not expressly—in the RFA, and evidence of it can be detected only in an internal document, the Briefing Book. The Briefing Book was prepared by DTE staff, AR 53, and the Government describes the document as OSHA's "official evaluation report," Def.'s Reply at 10. According to the Briefing Book, in the Level 1 Review, OSHA screened the applications for 7 "eligibility criteria and critical elements." Although the RFA disclosed the 4 eligibility requirements, it did not identify the 3 "critical elements." After conducting the Level 1 Review, OSHA determined that 80 out of the 162 applications received did not meet "the established criteria" and they were not given further consideration. AR 58, 149-54; *see* Def.'s Mot. JAR at 15. In the Level 2 Review, OSHA

---

[5] While OSHA provides no funding to the training providers, it authorizes providers to charge fees to students and sets the maximum fee that each provider may charge. AR 2.

evaluated each application that passed the first level review for all of the selection criteria disclosed in the RFA.

On January 12, 2012, OSHA announced that 10 different providers were being awarded with cooperative agreements, based on 25 selected applications.  None of 360's applications was selected for award.  According to the Briefing Book, OSHA found that 360 did not meet the eligibility requirements because 360 was on probation at the time it submitted the applications.

> **3.    360's Applications and 360's Past Performance as an Online Provider of Outreach Training**

360 is a Texas corporation that is in the business of providing and supporting e-learning technology and content.  Although 360 sells a variety of training courses across multiple industries and markets, approximately [***] of all the courses sold in 2011, involved the Outreach Training Program.  Clyde Seepersad Aff. ¶¶19, 143.  360 has been an authorized provider of online outreach courses since 2005.  Prior to its unsuccessful applications, 360 offered several different outreach courses, including 10-hour and 30-hour courses in construction and in general industry.  360 sold the courses through its own website, but it also partnered with a large number of resellers.

On June 24, 2011, 360 timely and properly submitted five applications in response to the Solicitation.  360 submitted one application for each course it was applying for: 10-hour general industry, 30-hour general industry, 10-hour construction, 30-hour construction, and 10-hour construction (in Spanish).  At the time 360 submitted the applications, it was on probation.  Although it is not entirely clear what it means for an online provider to be on probation, it appears that providers can be put on probation for violating Outreach Program guidelines and that any further infractions while on probation could result in losing the right to provide online courses.  *See* AR 27-32; AR 277-80.

It is very clear from the record that OSHA's decision not to select 360 primarily was based on 360's past performance as an online provider of outreach training, and the Government devotes much of its briefs to detailing the reasons why OSHA found 360's performance to be unsatisfactory.  OSHA described 360 as its "most problematic provider."  AR 150.  According to OSHA, it has received "numerous and ongoing complaints" regarding 360's poor performance in providing online training, including problems with customer service, course-related issues, and problems using resellers.  AR 27-29.  In response to the complaints, OSHA notified 360, on March 26, 2010, that 360 was being put on "probation" for six months.  It appears that 360 came off of probation at the end of that period.

On February 17, 2011, OSHA sent 360 a letter advising 360 that it was not in compliance with Outreach Training Program guidelines.  AR 30-34.  In the letter, OSHA stated that 360 had failed to comply with the guidelines regarding advertising by both 360 and its resellers and that 360's advertising was "misleading at best."  AR 31.  In response, 360 informed OSHA that it had terminated nearly half of its reseller contracts and took other actions to address OSHA's concerns.  Compl. Appx. TST 226-30.  On May 27, 2011, OSHA determined that 360 did not

respond adequately to its February 2011 letter, and it put 360 on probation again for 12 months. The Government states that 360 is the only provider to have been put on probation.

## II.    The Administrative Record

After this Court denied the motion to dismiss, the Government filed the administrative record.  Subsequently, the parties agreed to supplement it with several documents.  However, in connection with its Motion for Judgment on the Administrative Record, 360 has filed two motions to supplement the administrative record.  In the first motion, 360 wishes to add portions of affidavits from three of 360's employees and a printout of the website of one of the awardees. 360 argues that this evidence goes both to the harm 360 suffered and to showing that OSHA's evaluation of other applicants was irrational and unreasonable.  The Government states that it does not object to the court considering some of these passages for the purposes of assessing the "harm element" of injunctive relief, but asserts they are irrelevant to the merits because they were not before the agency.

In its Second Motion, 360 wishes to add additional paragraphs from the three affidavits as well as letters that 360 sent to OSHA in 2010 and 2011 in response to OSHA's disciplinary letters.  360 asserts supplementation is necessary because the administrative record contains OSHA's letters to 360 informing 360 of problems with its performance and notifying 360 that it was being placed on probation.  However, the administrative record does not contain 360's response to these letters.  The Government does not object to supplementing the record with 360's letters to OSHA, although it states that 360 should have moved to supplement sooner.  For the same reasons as the first motion, the Government objects to adding the affidavits to the administrative record.

In general, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  A court may supplement the administrative record, however, if it finds that supplementation is necessary to ensure that "effective judicial review" is not frustrated. *Axiom Resource Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009).  Such supplementation should occur "if the existing record is insufficient to permit meaningful review consistent with the [Administrative Procedure Act]." *Id.*  "The purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to convert the arbitrary and capricious standard into effectively de novo review." *Id.* at 1380 (quotations omitted).

The Court agrees with the Government that the affidavits should not be admitted into the administrative record because they are not necessary for meaningful review.  The Court will consider the relevant portions as necessary for the harm element of injunctive relief, but that does not require the Court to supplement the record.  The Court agrees with the parties that the administrative record should be supplemented with 360's letters to OSHA.  The Court notes that both 360 and the Government are equally at fault for the omission; those documents should have been in the administrative record to begin with and 360 should have requested supplementation sooner.

Therefore, the Court denies 360's First Motion and it grants in part 360's Second Motion, admitting into the administrative record the correspondence between 360 and OSHA. Those documents are located in 360's Complaint for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction, Appendix A, at TST 213-23, TST 226-41, and TST 254. The Court denies the remainder of the Second Motion.

## III.    Standard of Review

This Court's bid protest jurisdiction is provided by the Tucker Act. 28 U.S.C. § 1491(b) (2006). The Tucker Act provides that, in a bid protest action, the Court reviews an agency's procurement actions under the standards set forth in the Administrative Procedures Act ("APA"), 5 U.S.C. § 706 (2006). 28 U.S.C. § 1491(b)(4); *see Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). Under the APA, the Court determines, based on a review of the record, whether the agency's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Under the APA standard adopted by the Federal Circuit, an agency's procurement decision may be set aside if (1) the decision lacked a rational basis or (2) the agency violated a procurement regulation or procedure. *Impresa*, 238 F.3d at 1332-33. Only the first ground is at issue here. A decision that evinces "rational reasoning and consideration of relevant factors" has a rational basis and should be upheld. *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1369 (Fed. Cir. 2009). However, if the agency's evaluation of proposals significantly differs from the evaluation process disclosed in the solicitation, the agency's decision can be found to lack a rational basis. *See Banknote Corp. v. United States*, 56 Fed. Cl. 377, 386 (2003), *aff'd* 365 F.3d 1345 (Fed. Cir. 2004) ("It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation"). In such cases, a court's role is to "determine whether the agency's . . . analysis was consistent with the evaluation criteria set forth in the [solicitation] . . . ." *Ala. Aircraft Indus., Inc. v. United States*, 586 F.3d 1372, 1375-76 (Fed. Cir. 2009).

In addition, when evaluating whether an agency's decision lacks a rational basis, a court must determine "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion . . . ." *Axiom Resource*, 564 F.3d at 1381 (quoting *Impresa*, 238 F.3d at 1333). A court should set aside an agency's decision if the agency "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or the decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus.*, 586 F.3d at 1375 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *see Nutech Laundry & Textile, Inc. v. United States*, 56 Fed. Cl. 588, 593 (2003) (stating that if the agency fails to provide "a reasoned explanation for its decision which is in accord with material facts contained in the administrative record," then the decision deserves no deference).

If a court determines that the agency's action lacked a rational basis, "then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005). To establish prejudice in a post-award

bid protest, the protestor must demonstrate not only some significant error in the procurement process, but also that there was a substantial chance it would have received the contract award but for that error. *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996).

If a court determines that the plaintiff is prejudiced by the agency's action, the court then addresses whether injunctive relief is warranted. For injunctive relief, in addition to determining the plaintiff's success on the merits, the court weighs the plaintiff's irreparable harm if the court withholds such relief, the balance of hardships to the respective parties, and the public interest in granting injunctive relief. *Centech Group, Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009).

Where the parties have filed cross-motions for judgment on the administrative record, as here, Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC") provides a procedure for parties to seek the equivalent of an expedited trial on a "paper record, allowing fact-finding by the trial court." *Bannum*, 404 F.3d at 1356. Unlike summary judgment standards, genuine issues of material fact do not preclude a judgment on the administrative record. *See id.* at 1355-56. Questions of fact are resolved by reference to the administrative record. *Id.* at 1356.

## IV.    Discussion

In its Motion for Judgment on the Administrative Record, 360 advances three main arguments in support of its position. First, 360 argues that OSHA's decision lacked a rational basis because OSHA "failed to adhere to the provisions and standards set forth in the Solicitation." 360 complains about OSHA's two-level review, in which OSHA first screened applications for, not just the eligibility requirements in the RFA, but several additional, undisclosed requirements as well. 360 argues OSHA ignored the weighted selection criteria contained in the RFA when it evaluated 360's applications because the record shows that OSHA's evaluation was focused almost exclusively on two other factors: 360's past performance and its probationary status as an online provider. 360 argues that "where one factor is to have predominant consideration over the other factors, this should be disclosed to the offerors." Pl.'s Mot. JAR at 23 (quoting *Isratex v. United States*, 25 Cl. Ct. 223, 230 (1992)).

Second, 360 argues that OSHA's decision was not supported by the administrative record. It asserts that OSHA's evaluation was arbitrary and capricious because there are substantial and unexplained inconsistencies among the documents in the administrative record. Third, 360 challenges OSHA's assessment of 360's past performance, arguing that it was irrational in light of the new restriction on reselling agreements.

In its Cross-Motion, the Government argues that OSHA has significant discretion in choosing the appropriate evaluation process. It asserts that OSHA's two-level review was consistent with the RFA because "there was certainly no procedure requiring otherwise." Def.'s Mot. JAR at 15. The Government maintains that it was reasonable for OSHA to consider the organization's probation status and past performance in making an award. The Government also argues that OSHA's evaluation was proper and adequately documented by the record. Finally,

the Government asserts that OSHA's assessment of 360's past performance was fully in accordance with the record and relevant to OSHA's award decision.

An agency has the discretion to determine the appropriate process for evaluating proposals. *Fulcra Worldwide, LLC v. United States*, 97 Fed. Cl. 523, 539 (2011); *see* FAR 15.305(a) ("An agency shall evaluate competitive proposals . . . solely on the factors and subfactors specified in the solicitation. Evaluations may be conducted using any rating method or combination of methods . . . ."). However, where an agency specifies in a solicitation an evaluation and selection process, it must follow the disclosed process. *See Ala. Aircraft Indus.*, 586 F.3d at 1375; *Fulcra Worldwide*, 97 Fed. Cl. at 539 ("If an agency commits itself to a particular methodology in the solicitation, it must follow that methodology."). The Court's role is "limited to determining whether the evaluation was reasonable [and] consistent with the stated evaluation criteria . . . ." Def.'s Mot. JAR at 13 (quoting *JWK Int'l Corp. v. United States*, 52 Fed. Cl. 650, 659 (2002), *aff'd* 56 Fed. Appx. 474 (Fed. Cir. 2003)).

In reaching a decision, the focus of the Court's analysis is on the evaluation process OSHA used to select awardees and whether that process was consistent with the RFA and whether OSHA's decision was consistent with the evidence. Thus, the Court starts by examining the evaluation process disclosed in the RFA and comparing it to the two-level process adopted by OSHA. Next, the Court will review the contemporaneous documentation contained in the administrative record because there appear to be some inconsistencies among the documents. Finally, the Court will examine OSHA's evaluation of 360's applications to determine whether it was consistent with the RFA.

## A.     The Evaluation Process as Disclosed in the RFA and as Described in the Briefing Book

In this section, the Court determines how a reasonable potential applicant would read the RFA and then compares it to the process described in the Briefing Book. In the next section, the Court examines the administrative record, noting how it does not track the process described in the Briefing Book. Indeed, the discrepancies and lacunae in the administrative record suggest that the process that OSHA actually followed departed from that described in the Briefing Book as well as from that disclosed in the RFA.

### 1.     The Evaluation Process Disclosed in the RFA

The RFA spans 9 pages of the Federal Register. The RFA contains, in relevant part, the following sections: Summary, Applicant Eligibility, Application and Submission Information, Program Narrative, Selection Criteria, and Application Evaluation and Selection Process. The bulk of the RFA is directed to describing the eligibility requirements, the selection criteria, and the evaluation process that OSHA would use to evaluate the applications.

The RFA starts with a brief, one paragraph "Summary." In ordinary usage, "summary" means a more general statement of what has been expressed or what is to be detailed later. In the RFA, however, the "Summary" appears to be more of an introduction. The "Summary" announces that OSHA was seeking organizations to become online providers of 10-hour and 30-

hour OSHA outreach courses.  It provides that even current OSHA-authorized online providers had to submit applications, and it discloses that "[p]ast performance will be considered as a factor in the selection process."  AR 1.  Departing from the usual expectation of a summary, the RFA makes no further mention of past performance.

Next, the RFA sets forth the specific eligibility requirements in a section labeled "Applicant Eligibility."  The RFA provides that, to be eligible to apply, each organization must demonstrate that:

> (1) Training or education is part of its mission and more than 50% of its staff and dollar resources are devoted to training or education . . .;
> (2) It has the appropriate infrastructure and experience in developing, conducting, and evaluating online training;
> (3) It has experience in developing, delivering, updating and evaluating occupational safety and health training;
> (4) It has or will contract with one or more authorized OSHA Outreach Training Program trainers supporting each of the courses for which it is submitting an application.  These trainers must demonstrate that:
> (a) They each have a minimum of 3 years training experience;
> (b) They each are in good standing (not on probation, suspended, or revoked as defined in OSHA's Investigation and Review Procedures).

AR 2.  The RFA requires applications to include a "Program Narrative," which is a detailed description of the applicant organization and the proposed course offering.  The RFA dedicates approximately 5 pages to delineating the required contents of a program narrative.  AR 3-9.

Next, in a section labeled "Selection Criteria," OSHA disclosed the selection criteria and subcriteria that it would use to select applications from eligible organizations.  AR 9-11.  These criteria largely correspond to the headings and main points disclosed in the Program Narrative section.  The RFA provides that "Applications will be reviewed and rated as follows:

> (1) Organizational Experience and Qualifications (20 points);
> (2) Staff Experience and Qualifications (10 points);
> (3) Course Content (15 points);
> (4) Course Design (20 points);
> (5) Technical Capabilities (10 points);
> (6) Administrative Capabilities (15 points); and
> (7) Trainee Evaluation (10 points).

AR 9-11.  The RFA also breaks the criteria down into subcriteria and provides more information about what OSHA was looking for in each selection criterion.  For example, under Organizational Experience and Qualifications, the RFA lists the following subcriteria:

> (a) Demonstrate successful experience designing, developing, delivering and evaluating occupational safety and health training and successful experience training adults.

(b) Demonstrate successful experience in developing interactive online training courses for the target audience in work-related subjects.
(c) Show positive customer service and responsiveness to problems and comments from previous trainees.
(d) Demonstrate compliance with Outreach Training Program guidelines.

AR 10.

The Court already has noted that past performance, although mentioned in the "Summary" as a selection factor, never again appears in the RFA in so many words. As it would be inexplicable to *summarize* the RFA as including past performance as a selection factor and not to find it again in the sections that lay out the details of the selection process, the Court assumes that the 4 subcriteria listed above, as they are backward-looking, are a specification of this factor.[6]

The Application Evaluation and Selection Process section of the RFA discloses the evaluation process that OSHA would use. The RFA discloses that "[o]nline course applications will be reviewed by technical panels comprised of OSHA staff." AR 11. The technical panels would review applications "against the criteria listed in [the RFA]," AR 11, and would score those applications "on the basis of 100 maximum points," AR 10. The technical panels' review was "to determine which applicants best meet the stated requirements." AR 11. The RFA provides that "applicants will be selected based upon the . . . selection criteria." AR 9. However, the RFA provides that the panels would make "recommendations to the Assistant Secretary" that were "advisory in nature" and that "the final decision will be made by the Assistant Secretary of Labor for Occupational Safety and Health." AR 11.

Although the RFA does not specify every detail of how OSHA will select awardees, it discloses the basic evaluation process by which OSHA would make its decision. That process can be summarized as follows. OSHA would consider applications from organizations that met the eligibility requirements. Technical panels would score the applications on a 100-point scale based on the weighted selection criteria, and the panels would make a recommendation of which applicants should be selected. The Assistant Secretary would then act as the source selection authority and select for award the applications that best met the selection criteria. *See generally* FAR 15.300 to 15.308 (source selection process in negotiated procurements).

## 2.     The Evaluation Process Described in the Briefing Book

---

[6] Although it is possible that OSHA intended to make past performance an independent, general factor in the selection process, to alert potential applicants in the "Summary" and nowhere else would make the RFA misleading, arbitrary, and capricious. The Court chooses to follow legal precedent by making sense of the RFA as a whole through interpretation rather than invalidating it by determining that the "Summary," in effect, does not summarize.

The evaluation process described[7] in the Briefing Book is different from that disclosed in the RFA.  In an apparent effort to reduce the amount of work it had to do, *see* Def.'s Mot. JAR at 15 (noting that each application typically ran to hundreds of pages and stating "it would amount to an enormous administrative burden if the agency were required to conduct a second level review for all 162 applications"), OSHA decided to conduct a two-level review, where it would screen out certain applicants in a first level review before conducting a detailed second level review.  Of course, there is nothing unreasonable about conducting a first level review based on the disclosed eligibility requirements and a second level review based on the RFA selection criteria.  Unfortunately, OSHA did not do this.

### a)       The Level 1 Review

According to the Briefing Book, the Level 1 Review was a "preliminary review," where OSHA evaluated the applications for "eligibility criteria and critical elements."  AR 58.  As the term "critical elements" was not used in the RFA, the Court wonders what they are.  In the Briefing Book, OSHA defined the "eligibility criteria and critical elements" as:

- The organization had to demonstrate that[:]
  o  it has the appropriate infrastructure and experience in developing, conducting, and evaluating online training[;]
  o  it has experience in developing, delivering, updating and evaluating occupational safety and health training[;]
  o  it has or will contract with one or more authorized OSHA trainers that have a minimum of three years training experience and are in good standing (not on probation, suspended, or revoked)[;]
  o  training or education is part of its mission and more than 50% of its staff and dollar resources are devoted to training or education[; and]
  o  if currently authorized, its past performance was at a satisfactory level[.]
- It had a viable authentication process to randomly verify that the trainee who registers for the course is the same trainee who participates and completes the training.  Secure login, unique ID, PIN, and passwords, and challenge questions based on third party data were not considered sufficient.  Feasible examples included scanned fingerprints or eyes, webcam, or voice signature.
- A separate application for each different course and language.

AR 58.

The first 4 "eligibility criteria and critical elements," indented above under the first bullet point, mirror the eligibility requirements in the RFA.  By process of elimination, then, the Court

---

[7] Although the Court uses the word "described," it perhaps would be more accurate to say "discerned" because the Briefing Book's description of the process is incomplete.  For example, the Briefing Book contains an "agenda" for an "Online Training Provider Selection Meeting" but that meeting is not described as part of the selection or evaluation process.  The Court, therefore, has discerned the process OSHA was trying to describe by looking at the information and evaluations contained in the Briefing Book and making logical inferences therefrom.

supposes that the remaining requirements are the "critical elements." Had OSHA applied only the disclosed eligibility requirements in the Level 1 Review, the Level 1 Review arguably would be consistent with the RFA. The introduction of the "critical elements," however, is a departure from the RFA. The Court comes to this conclusion despite the fact that the first two "critical elements" were mentioned in the RFA,[8] because they were not identified as critical nor given any special significance. In other words, they may be "elements," but they were not identified as "critical."

The Court notes that past performance is one of the supposed critical elements. But even if the mere mention of past performance in the "Summary" section of the RFA would be sufficient to make past performance an evaluation criterion, nothing in the RFA can be construed as disclosing that "past performance . . . at a satisfactory level" would be an *eligibility requirement*.

Turning to the "critical element" of authentication, the Court recognizes that, as a subcriterion of the Technical Capabilities (10 points) criterion, the RFA disclosed that applicants must describe the authentication process they will use to randomly verify that the person actually taking the course is the person who registered. But this subcriterion was not given any special importance or otherwise flagged as critical. *See* AR 7, 10. The RFA only directed applicants to "explain" the trainee authentication process, and it did not disclose the minimum requirements for an acceptable authentication process, such as the frequency of verifications.[9]

In sum, by elevating the "critical elements" to be part of a "preliminary" eligibility determination, OSHA effectively turned them into eligibility requirements. Applicants were not on notice that those elements would be evaluated in isolation and that the failure to satisfy the "critical elements" would result in immediate elimination from the competition. The addition of these requirements effectively deprived applicants of the opportunity to adequately support those criteria and of a fair chance to compete for an award. The Court agrees that an agency must disclose that a failure to satisfy a selection criterion or subcriterion will result in automatic rejection. *Isratex*, 25 Cl. Ct. at 230. Because OSHA added the additional eligibility requirements and disqualified applicants that did not satisfy those requirements, the Court finds that the Level 1 Review was inconsistent with the RFA.

### b)      The Level 2 Review

For the applications that survived the preliminary review, OSHA then conducted the Level 2 Review, where it evaluated each application for all of the selection criteria in the RFA.

---

[8] As for the final "critical element," the RFA did not explicitly disclose that applicants must submit a separate application for each course. *See* AR 3. However, at the proposal conference, OSHA clarified that a separate application is required for each course. Compl. Appx. TST 24. The slides that were distributed at the meeting were included as an appendix to the complaint. For some reason, this document is not in the administrative record, and therefore, the Court does not rely on it.

[9] The RFA did not even fully describe the acceptable technical implementations of this process; it merely provided several examples of acceptable (e.g., scanned fingerprints, webcam, or voice signature) and unacceptable (e.g., PIN numbers, passwords, and challenge questions) technical implementations.

AR 58.  Although the Briefing Book speaks of "reviewers" conducting the review, it makes no mention of the technical panels referred to in the RFA nor does it explain how the reviewers' evaluations were reconciled into the final evaluations contained in the Book.  According to the Briefing Book, "[f]ollowing the review, each application was rated [as being] in one of the [following] three categories":

> **Meets Criteria** – The application demonstrates adequate program design and addressed the required elements.
> **Marginally Meets Criteria** – The application has enough of the required program design and rigid elements to qualify as acceptable, but also has significant shortcomings.  This may include a lack of details in key program areas.
> **Does Not Meet Criteria** – The proposal does not meet the program criteria specified in the *Federal Register* Notice.  The application may also have other deficiencies.

AR 59.  For each application that was rated overall as Meets Criteria or Marginally Meets Criteria, DTE prepared a 1-page evaluation that was included in the Briefing Book.  Each evaluation starts with some basic information about the applicant, the applicant's past performance, and the proposed course offering, and then it lists the 7 selection criteria from the RFA, with some comments and a descriptive rating for each criterion.[10]  Left out of evaluations was the point score assigned to each criterion and the criterion's weight.  For each application that was rated Does Not Meet Criteria, the Briefing Book lists just several brief comments.

The Briefing Book mentions an "Online Training Provider Selection Meeting."[11]  AR 53, 59.  Based on the agenda for the meeting, it seems that at this meeting DTE formulated its list of final recommendations for the Assistant Secretary.  AR 53.  The Court cannot be sure of that, however, because the administrative record does not contain any minutes or other record of that meeting nor the final recommendation list.  Presumably, the Assistant Secretary selected awardees from the final list or from the Briefing Book, but the exact process he used and the information he considered are not disclosed in the administrative record.

There are several problems with the process adopted for the Level 2 Review.  First, the evaluations do not contain all of the information relevant to the evaluation process disclosed in the RFA.  Although each evaluation is divided into the 7 selection criteria, the ratings are descriptive.  The use of descriptive ratings is inconsistent with the RFA, which provided that applications would be assigned point scores on the basis of 100 points.  Second, the evaluations do not list the weighting for each criterion so it appears that each criterion is weighted equally.  The RFA disclosed a weighting scheme for the criteria and OSHA's decision to abandon that weighting in its official evaluation report was improper.  Third, the applicant information section of each evaluation has a separate entry for past performance, and the Court cannot discern how

---

[10] The possible descriptive ratings for each criterion are the three listed above: Meets Criteria, Marginally Meets Criteria, or Does Not Meet Criteria.

[11] According to an agenda contained within the Briefing Book, the Book was prepared in advance of this meeting.

much weight OSHA would have placed on that factor.  Finally, if the Briefing Book was the only document that the Assistant Secretary considered when selecting awardees, all the problems just listed would have prejudiced his final decision.  This last point is speculation, of course, because absent from the record is any information about what was before the Assistant Secretary when he selected awardees.

In conclusion, the Court finds that there are substantial inconsistencies between the evaluation process disclosed in the RFA and the process that OSHA described in the Briefing Book.

### B.    The Evaluation as Documented in the Administrative Record

As noted earlier, the Court's examination of the administrative record causes it to conclude that, not only did OSHA not follow the RFA, but it did not even follow the process that it described in the Briefing Book; instead, it appears that OSHA may have followed another process that is altogether mysterious.

The Court's conclusion is based on the contemporaneous records created as part of the Level 1 and Level 2 Reviews.  In addition to the Briefing Book, the administrative record contains three other documents that were created as part of OSHA's evaluation of the applications.  Two documents are spreadsheets that appear to summarize each level of review: one is identified as "highlights of level 1 review" ("Level 1 Highlights"), Tab 25, AR 6095-39, and one is identified as the Master Application Review, Tab 26, AR 6140-72.[12]  The other document is entitled "Online Reviewer Aid," and it appears to be an instruction sheet for the Level 2 Review that was created after the Level 1 Review took place.  AR 6090.

After reviewing these documents, the Court cannot discern the exact process OSHA used to evaluate the applications because there are many inconsistencies among the documents and the contemporaneous evaluations do not match OSHA's final conclusions.  In trying to reconcile these records, the Court must take note of some of the details of OSHA's rating decisions.  Although the Court is looking at the particular ratings OSHA gave to certain applications, it is only to determine whether OSHA considered the appropriate factors—the selection criteria—and whether the process OSHA used was consistent with the RFA.  The Court expresses no opinion on OSHA's judgment of the technical ratings given to the applications.  The Court does not wish to wade into "the minutiae of the procurement process in such matters of technical ratings."  *See E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996).  So long as the agency considers the appropriate factors and its decision evinces rational reasoning, the Court will defer to the agency's decision.  *Weeks Marine*, 575 F.3d at 1369.  Deference is inappropriate, however, where an agency fails to provide "a reasoned explanation for its decision which is in accord with material facts contained in the administrative record."  *Nutech Laundry*, 56 Fed. Cl. at 593.

The only document that seems to correspond to the Level 1 Review is the Level 1 Highlights spreadsheet.  That spreadsheet contains one entry, or row, for each applicant organization and has column headings that roughly correspond to the eligibility requirements

---

[12] These both are a Microsoft Excel files.

disclosed in the RFA.  It also contains columns for the 3 critical elements that OSHA adopted as eligibility requirements.  AR 6135-39.  It appears that, for each eligibility requirement, OSHA assigned one staff member the responsibility to review all of the applicant organizations for that requirement.  For each requirement, applicant organizations were rated "Meets," "Low Meets," or "Does Not Meet."[13]  On its face, the document seems to represent OSHA's evaluation of which organizations had satisfied the eligibility requirements.

Sometime after the Level 1 Highlights sheet was finalized, however, OSHA apparently changed its mind about some of the evaluations.  The Online Reviewer Aid document lists the organizations for which a second level review was not required.  The problem is that this list of organizations is inconsistent with the ratings recorded in the Level 1 Highlights sheet.  For example, AdvanceOnline Solutions, Inc., was rated in the Level 1 Highlights as "Does Not Meet" for its safety and health experience, AR 6135, but that applicant was evaluated in the second level review and ultimately selected for award, AR 320.  CareerSafe, LLC, was rated "Low Meets" for its outreach staff, AR 6135, but it too was evaluated in the second level review and ultimately selected for award, AR 327.  On the other hand, 360 was rated "Meets" in all categories, but the Online Reviewer Aid document lists 360 as an organization for which "no further review is necessary."  AR 6135.[14]  The record contains no evidence of meetings or further evaluations that could explain these discrepancies.

The Online Reviewer Aid document appears to have been intended for distribution to the OSHA staff members who actually were to conduct the Level 2 Review, but no evidence confirms whether or to whom it was distributed.[15]  The document instructed each reviewer to make a copy of the Application Review spreadsheet, to save it with his name on the end, and to record his evaluations in his spreadsheet.  Each reviewer was to evaluate each application based on the selection criteria in the RFA, and for each criterion, make comments, award points, and assign it one of three descriptive ratings: Meets Criteria, Marginally Meets Criteria, and Does Not Meet Criteria.  AR 6090.  The document did not provide any guidance for assigning descriptive scores; it did not describe the characteristics of an application that Meets Criteria or Marginally Meets Criteria, and it did not link the descriptions to point score cutoffs.

Although each person participating in the Level 2 Review was supposed to save his ratings in an individual file, the administrative record does not contain a spreadsheet for each reviewer.  Instead, it contains one spreadsheet that is labeled "Master Application Review."  That spreadsheet contains one evaluation for each application that advanced to the Level 2 Review.  There is no indication in the record as to how the Master Application Review was compiled.  Although a "lead reviewer" is specified for each application, the Court cannot tell if the evaluation represents a composite of scores from multiple reviewers or whether each score came from just the one individual "lead" reviewer.

---

[13] The ratings were not consistent among the reviewers.  Some of the ratings include "Low Meets," "Meets (Low)," "Meets (Weak)," and "Meets (Limited)."  *See* AR 6135-37.

[14] The Government points out that several other applicants were rated as "Meets" in this document but were listed as "Does Not Meet Criteria" in the Briefing Book.  Def.'s Reply at 11.

[15] The record does not indicate who actually created the document either.

In the Master Application Review, the evaluations of each application seem mostly consistent with the process described in the Online Reviewer Aid, i.e., comments, numerical score, and descriptive score for each of the 7 selection criteria.  However, the descriptive ratings were not applied consistently, and similar numeric scores were assigned different descriptive ratings.  For example, one applicant, Digital 2000, Inc., received a total point score of 73 and was labeled "Marginally Meets Criteria" while another applicant, Fortis Business Media, Business & Legal Resources, received a score of 70 and was labeled "Meets Criteria."  *See* AR Tab 26 (under the 10-hour construction section).

Following the Level 2 Review, OSHA prepared the Briefing Book, which contains OSHA's official evaluations of the applications.  As described above, while each evaluation contains descriptive ratings for each of the 7 selection criteria, it does not contain a numerical score nor the weighting of the selection criteria.  AR 59.  Although the Briefing Book contains OSHA's evaluations, it is not clear what OSHA considered in making those evaluations.  It does not appear that OSHA just transcribed the evaluations from the Master Application Review[16]; while many of the ratings listed in the Briefing Book match the ratings in the Master Application Review, some are very different.  For example, one applicant, American Association of Safety Councils, got a perfect score of 100 for its General Industry 10-hour course, AR 6257, but was rated "Marginally Meets Criteria" in the Briefing Book, AR 127, and it was not selected for an award.  Another applicant, American Safety Council,[17] received numeric scores of 79, 83, and 84 for its 10-hour construction courses and was rated as "Meets Criteria" in the spreadsheet, but in the Briefing Book, it was rated as "Marginally Meets Criteria."  Three other applicants that were rated as "Meets Criteria" in the Master Application Review and which ultimately were selected as awardees, received for their 10-hour construction courses lower or equal scores: CareerSafe (79), AR 6246, SafetyUnlimited (75), AR 6251, ComplianceSolutions (79), AR 6247.

In sum, there are significant gaps between the documents in the administrative record.  The Court cannot tell how OSHA formed its final evaluations or whether OSHA considered the appropriate factors when it apparently decided to change its ratings.  All that the Court can conclude from the administrative record is that OSHA's final decision was inconsistent with the contemporaneous documentation of the evaluation process and that OSHA has not provided a reasonable explanation for its decision.

## C.   OSHA's Review of 360's Applications

Turning back to 360's applications specifically, the question is whether OSHA's evaluation of 360's applications was affected by the irregularities in OSHA's adopted evaluation process.  According to 360, there are several problems with OSHA's review of 360's applications.  The Court divides these problems into 4 parts.  First, OSHA considered the "organization's probation status" an eligibility requirement as part of its first level review.

---

[16] As for the organizations that were rated Does Not Meet Criteria because they were found ineligible to apply and not evaluated in the Level 2 Review, the Court notes that many of the evaluation comments in the Briefing Book do not match the comments in the Level 1 Highlights sheet.

[17] As mentioned, *supra*, American Safety Council is the plaintiff in a related bid protest.

Second, any evaluation of 360's applications by OSHA was focused almost exclusively on past performance. Third, OSHA's evaluation was irrational because 360's rating in the Briefing Book is inconsistent with the Level 1 Highlights. Fourth, OSHA's judgments regarding 360's past performance are unsupported by the record.

> 1.    **OSHA Disqualified 360 Based on Undisclosed Eligibility Requirements.**

In the Briefing Book, 360 was rated as Does Not Meet Criteria. Because the Briefing Book contained full evaluations only for applications that were rated Meets Criteria or Marginally Meets Criteria, it does not contain a full evaluation for 360 but instead lists the following 5 comments:

- *As a result of the organization's probation status, organization does not meet eligibility requirements.* The Federal Register Notice states that Outreach trainers must be 'in good standing (not on probation, suspended, or revoked as defined in OSHA's Investigation and Review Procedures).'
- Currently authorized online Outreach Training Program provider; only 3% student increase from 2010.
- Much of current online Outreach training is through resellers.
- By a considerable margin, organization has been the most problematic provider. Many issues involve the lack of control of reseller advertising, other misleading advertising, problems with customer support and poor survey procedure.
- Current staff of one full-time trainer and one part-time trainer lacks significant industry safety and health experience; application does not indicate the plans for two other trainers included in the course, and organization also lacks adequate industry safety and health experience.

AR 150 (emphasis added).[18]

Based on OSHA's comments in the Briefing Book and the Online Reviewer Aid document which listed 360 as not requiring further review, the Court finds that OSHA determined that 360 was ineligible to apply because 360 was on probation.

The Government argues that Eligibility Requirement (4)(b) of the RFA discloses that the organization's probationary status was an eligibility requirement. Eligibility Requirement (4) provides that "each organization" must demonstrate that it will contract with one or more "authorized OSHA Outreach Training Program trainers" and that "[t]hese trainers must demonstrate that: (a) They each have a minimum of 3 years training experience; [and] (b) They each are in good standing . . . ." AR 2. The Government asserts that the good standing provision applies to the applicant organization because the word "trainers" refers both to the outreach

---

[18] It is unclear where these comments came from because none of the comments about 360 in the Level 1 Highlights sheet was negative.

trainer and the applicant organization.  360 asserts that the text of the RFA is clear and only each individual outreach trainer had to be in good standing.

In interpreting the terms of the RFA, the Court starts with the plain language of the document.  *Banknote*, 365 F.3d at 1353.  The Court will consider the RFA as a whole, "interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions."  *Id.*

Throughout the Applicant Eligibility section, applicants are referred to as "organizations" and not "trainers."  The only mention of "trainers" appears in Eligibility Requirement (4), where the RFA requires applicants to contract with authorized Outreach Training Program trainers and describes the minimum requirements for those trainers.  The Court finds that Eligibility Requirement (4)(b) clearly and unambiguously provides that the individual trainers must be in good standing.  The Court therefore concludes that the good standing requirement applies only to the trainers with which an applicant organization contracts and not to the organization itself.

In the alternative, the Government argues that, even if "trainers" is limited to the outreach trainer, the organization's probation status still is relevant because it is intrinsic to the trainer's probation status.  "In other words, because 360, the parent company, is on probation, it was reasonable for the agency to find that 360's trainers are on probation as well."  Def.'s Mot. JAR at 17.  360 simply maintains that the organization's probation status is not intrinsic to the trainer's status.

The Court finds that the organization's probation status is not intrinsic to the trainer's probation status.  The record shows that a trainer's authorization status is wholly independent from the trainer's affiliation with an online provider.  A trainer becomes authorized by taking the appropriate courses and there is no requirement that the trainer be sponsored or otherwise supported by an online training provider.[19]  Outreach trainers may conduct in-person training, unconnected with the online course and online provider.  In addition, according to the "Investigation and Review Procedures" that OSHA cites in the RFA, a trainer cannot be put on probation without being notified of the allegations and given a chance to respond, among other due process rights.  AR 278-79.[20]  OSHA cannot just deem a trainer to be on probation.

Additionally, the Court finds that no other part of the RFA discloses that the applicant's probation status would be an eligibility requirement.  Although the "Summary" of the RFA mentions that past performance will be considered, the RFA does not indicate that past performance is an eligibility requirement.  Nor would a reasonable reader interpret the mention of past performance in the RFA "Summary" as imposing an eligibility requirement separate from those disclosed in the Applicant Eligibility section.  *See* Section IV.A., *supra.*

---

[19] As explained *supra*, a trainer's authorization is managed through the trainer's ATO, which typically is the OTIEC which trained the trainer.  360 is not an ATO.

[20] The Investigation and Review Procedures also are available online, at http://www.osha.gov/dte/outreach/investigation_procedures.html (last visited: July 12, 2012).

Therefore, the Court finds that the RFA does not disclose the applicant organization's probation status as an eligibility requirement.  Accordingly, the Court finds that OSHA's decision to disqualify 360 from consideration after the Level 1 Review based on 360's probation status was arbitrary and capricious and it lacked a rational basis.

### 2.      OSHA Misapplied the Selection Criteria by Placing Outsized Emphasis on 360's Past Performance.

Even though the Briefing Book states that OSHA found that 360 was ineligible to apply, the Government argues that OSHA actually did evaluate 360's applications.  Def.'s Reply at 4-5; Def.'s Mot. JAR at 14-15.  It argues that the comments indicate that OSHA went ahead and reviewed 360's applications and that OSHA concluded that 360 did not meet the criteria.  The Government asserts that it was reasonable for OSHA to consider past performance in selecting awardees.  It argues that it is "a well-settled rule that where a solicitation fails to specify the relative weights of technical and price factors it must be presumed they are of equal weight." Def.'s Mot. JAR at 20.  Applying that principle by analogy, it asserts that past performance should be assigned a weight of 10 to 20 points.  *Id.*

360 argues that to the extent OSHA considered its applications, OSHA did not base its decision on the selection criteria.  It argues that the comments show that OSHA did not evaluate it based on the selection criteria but instead evaluated 360 based almost exclusively on 360's past performance.  360 does not dispute that it was proper for OSHA to consider past performance in the evaluation of applications.  360 maintains, however, that, because past performance was mentioned only as a factor to be considered and was not listed as a selection criteria, OSHA cannot treat past performance as a selection criterion independent of the 7 specified.  Pl.'s Reply at 12-13.

Based on the language of the RFA, construed in the context of the document as a whole, the Court finds that past performance was not an additional, independent selection criterion.  In the context of the rather detailed discussion of the application contents and selection criteria, it makes no sense to interpret a mention of past performance in a section that purportedly summarizes the RFA as establishing an 8th selection criterion.  When the reference to past performance in the "Summary" is considered together with the selection criteria and subcriteria, the only reasonable reading of the RFA is that past performance would be considered only in the context of the disclosed selection criteria and subcriteria.  *See* Section IV.A., *supra.*

Turning back to OSHA's review of 360's applications, the Court finds that, to the extent that OSHA did consider 360's applications, OSHA placed undue weight on past performance given the disclosed role of past performance in the evaluation process.  The Briefing Book contains 5 comments about 360, but 4 of the 5 comments relate to past performance.  The emphasis that OSHA placed on 360's past performance was inconsistent with the proper consideration to be given to past performance, which is in the context of the selection criteria and subcriteria.

The Government also asserts that, OSHA can place whatever weight it wants on past performance and 360 cannot object because past performance was vaguely mentioned in the

RFA and 360 failed to object prior to the close of bidding.  However, because the Court finds that it is not reasonable to interpret the mention of past performance in the "Summary" section of the RFA as establishing an additional selection criterion, the RFA did not contain a patent ambiguity, and therefore, 360 did not have an obligation to challenge the ambiguity before bid closing.  *See Blue & Gold Fleet v. United States*, 492 F.3d 1308 (Fed. Cir. 2007) (finding that protestor had an obligation to object to patent ambiguity before solicitation closes); *Triax Pac., Inc. v. West*, 130 F.3d 1469, 1475 (Fed. Cir. 1997) (finding that the presence of a patent ambiguity is determined by what a reasonable offeror would have perceived in studying the solicitation).

The Court finds that OSHA did not evaluate 360's applications in accordance with the RFA because OSHA failed to evaluate 360's applications according to the selection criteria and evaluation process disclosed in the RFA.  Therefore, the Court finds that OSHA's decision lacked a rational basis.

### 3.   OSHA Failed to Provide a Reasonable Explanation for its Decision.

360 argues that OSHA failed to provide a reasonable explanation for its decision and that the decision was not supported by the administrative record.  360 correctly states that, in the Level 1 Highlights, 360 was rated as "Meets" for all eligibility requirements.  360 argues that, despite its rating in the Level 1 Highlights, the Online Reviewer Aid document listed 360 as not requiring further review.  AR 6090; *see* Pl.'s Reply at 2-3.  360 asserts that OSHA's failure to explain this discrepancy shows that OSHA's decision was arbitrary and capricious.  Pl.'s Reply at 16-19.

The Government asserts that OSHA properly documented its decision-making process.  The Government describes the Level 1 Highlights document as an "initial intake screening document" and criticizes 360's reliance on it.  Def.'s Reply at 10.  It argues that, because 360 and some other applicants were rated as "Meets" in that spreadsheet and then ultimately rated as "Does Not Meet Criteria" in the Briefing Book, the "intake spreadsheet was clearly not the final or controlling evaluation report."  Def.'s Reply at 11 (identifying several other applicants besides 360 whose rating changed between the spreadsheet and the Briefing Book).  Therefore, the Government asserts, the initial rating is irrelevant because OSHA changed its mind in the final report.

The Court agrees with the Government that "clearly" the Level 1 Highlights is not the controlling evaluation and that "clearly" it is not the final Level 1 evaluation.  But that begs the questions of where is the controlling Level 1 evaluation and why is it not in the administrative record?  The Court also agrees that "clearly" the agency changed its mind following a subsequent evaluation.  Contrary to the Government, that does not justify the discrepancy but rather states the problem: the agency changed its mind during an undocumented review conducted by unknown persons based on unknown factors.  All the relevant considerations were listed in the Level 1 Highlights, and it is unclear why OSHA would need to revisit the evaluations.

The Court is troubled by the unexplained change and by the lack of any documentation for it in the administrative record.  The Court is equally troubled by the other glaring inconsistencies among the four documents that relate to OSHA's evaluation of applications, as discussed above.  Nothing in the record explains the gaps between these documents and the differences in the evaluations.  Moreover, OSHA appears to have been unable to follow whatever process it did adopt.  Not only did the process described in the Briefing Book not match the RFA, the evaluations documented in the record do not match the process in the Briefing Book.  The Court can conclude only that OHSA's decision runs counter to the evidence in the record, and if OSHA had a reason for rejecting that contrary evidence, OSHA has not provided any explanation of its decision.

### 4.  OSHA's Assessment of 360's Past Performance

360 alleges that OSHA treated 360 more harshly than a number of other applicants.  Pl.'s Mot. JAR at 12-14; Pl.'s Reply at 2-5.  360 asserts that OSHA did not apply the same scrutiny to its review of other applicants' reseller histories.  360 asserts that OSHA's evaluations of its past performance are irrational because it was penalized for the poor performance of its resellers.  It also asserts that some of the awardees had no experience in online occupational health and safety training, which 360 asserts is a violation of the RFA.  Pl.'s Mot. JAR at 13.  360 also asserts that OSHA treated applicants disparately.

The Government asserts that OSHA treated the applicants equally and it only seems like OSHA reviewed 360's past performance more harshly because 360 was such a "poor performer." Def.'s Reply at 9.  It characterizes 360's arguments as an attempt to second guess the agency's technical evaluations.  Def.'s Mot. JAR at 26.  The Government argues that 360 was not punished for its resellers performance, but rather, for its failure to control its resellers.  Def.'s Mot. JAR at 22-23, 27.  The Government also argues that 360's contentions that its competitors lacked experience were self-serving and unsupported by the administrative record.

Although the Court has some questions about the relevance of OSHA's comments concerning 360's past performance, 360 has not established that OSHA's technical conclusions were irrational.  Nor has 360 established that the organizational experience possessed by some of the actual awardees was insufficient to support the rating OSHA assigned to those applicants.  Given the evidence in the record, the Court will defer to OSHA's technical evaluations.  In reviewing OSHA's decision, the Court is focusing on OSHA's evaluation process and not on the minutiae of the agency's technical ratings.

### D.  360 Was Prejudiced by OSHA's Error.

Even though OSHA's decision lacked a rational basis, 360 is not entitled to relief unless it was prejudiced by OSHA's decision.  The record shows that the evaluation process OSHA used deviated from the RFA, and as a result, OSHA disqualified 360 on the basis of an unstated eligibility requirement.  None of 360's applications were scored according to the disclosed selection criteria.  As 360 argues, had it known that its probation status was an eligibility requirement, it would have filed a protest at the outset that challenged the terms of the solicitation.

The Government argues that 360 could not have been prejudiced by OSHA's decision. However, most of the Government's arguments boil down to the proposition that, because it was rational for the agency to consider 360's past performance, OSHA can place on past performance whatever weight it wants.  Therefore, the Government argues, there is little reason to expect that "the agency would have selected 360, its most problematic current training provider, for award under any reasonable circumstance."  Def.'s Mot. JAR at 11.

The Court agrees that it is perfectly rational for an agency to consider a bidder's past performance in the selection process, and OSHA could have made past performance an independent selection criterion or otherwise assigned it significant weight.  OSHA did not do so.  Given the selection criteria and evaluation process that OSHA actually disclosed in the RFA, the Government cannot conclude that 360's past performance alone would be sufficient to disqualify 360 from receiving an award.  If OSHA applied the selection criteria as weighted, 360 would stand a substantial chance of award.  Therefore, the Court finds that 360 was prejudiced by OSHA's error.

### E.      360's Entitlement to Relief

360 has shown that OSHA's review of its applications lacked a rational basis and that it was prejudiced by OSHA's decision.  Therefore, 360 was successful on the merits and it is entitled to relief.  360 has requested the following relief: (1) a permanent injunction allowing it to continue offering courses under the terms of the cooperative agreement; (2) in the alternative, an injunction requiring OSHA to reevaluate its applications under the terms of the RFA; and (3) in the alternative, an injunction requiring OSHA to cancel the Solicitation and rebid the competition.

The Court finds that the appropriate remedy would be the cancellation of the awards followed by either a reevaluation of the applications pursuant to the terms of the RFA or a resolicitation of the competition with proper disclosure of the selection criteria and evaluation process that OSHA wishes to use.  The Court will not substitute its judgment for that of the agency and direct an award for 360.  And it would be pointless for the Court to have OSHA reevaluate 360's application under the terms of the RFA because none of the other applications were evaluated under those terms.

To determine the propriety of granting 360 injunctive relief, the Court weighs the 360's irreparable harm if the court withholds such relief, the balance of hardships to the respective parties, and the public interest in granting injunctive relief.  *Centech*, 554 F.3d at 1037; *see also PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed Cir. 2004).

360 has established that, absent injunctive relief, it will suffer irreparable harm.  Outreach training is a significant portion of its business, and the loss of the business from this solicitation will result in layoffs and potentially a threat to the viability of the business.  Further, the available money damages will not make 360 whole because it was deprived of a fair opportunity to compete for an award.

Cancelation of the awards is the most fair and equitable remedy. In providing a remedy that applied to 360 only, the other applicants whose ratings similarly were arbitrarily changed during undocumented reviews would be deprived of a fair chance as well. Although the current awardees are not guaranteed to be selected, they stand a substantial chance of winning again because OSHA has determined they meet its standards and OSHA has provided that it has no predetermined number of awardees but will select all applications that are of high quality.

There is an interest in ensuring that the government procurement process is fair and conducted as a full and open competition. Additionally, in the interim, the public will not lose the benefit of outreach training because, at minimum, in-person outreach training still will be available to workers. OSHA also has the option of permitting the prior providers or both the prior providers and the current awardees to provide online training, although not under the terms of the cooperative agreements. Although the public interest is somewhat harmed by the delay in the implementation of OSHA's new rules, the public benefits more by ensuring that the best possible providers are selected based on a fair competition.

Before granting injunctive relief, however, the Court will stay its hand and permit the agency to consider taking corrective action. Such action has been discussed in the context of the related bid protest involving American Safety Council. If the agency, the plaintiffs, and the Intervenor are unable to find an agreeable solution, then the Court will issue an appropriate permanent injunction. The precise scope of such injunction will be the subject of future proceedings.

## V.    Summary

Because there is some indication that OSHA is willing to consider corrective action, the Court in this section sets out the *major* defects that it has found in the selection process that OSHA followed, insofar as such a procedure can be determined from the administrative record.

### A.    Past Performance

The RFA cannot be reasonably interpreted as making past performance an eligibility requirement or as a selection criterion independent of those listed in the Selection Criteria part of the RFA.

### B.    Critical Elements

There is no indication in the RFA that there are "critical elements," that these critical elements would function as eligibility requirements, or that past performance and/or authentication would be considered critical elements.

### C.    Lack of Documentation

The RFA requires that technical panels be convened, that they apply the selection criteria, and that they assigned point values to the criteria. There is no clear evidence in the administrative

record that this procedure was followed.  Indeed, the Court found the administrative record to be puzzling.  As the Court stated in the body of this opinion:

> "After reviewing these documents, the Court cannot discern the exact process OSHA used to evaluate the applications because there are many inconsistencies among the documents and the contemporaneous evaluations do not match OSHA's final conclusions."

> "[T]here are significant gaps between the documents in the administrative record. The Court cannot tell how OSHA formed its final evaluations or whether OSHA considered the appropriate factors when it apparently decided to change its ratings.  All that the Court can conclude from the administrative record is that OSHA's final decision was inconsistent with the contemporaneous documentation of the evaluation process and that OSHA has not provided a reasonable explanation for its decision."

## VI.  Conclusion

The Court **DENIES** Plaintiff's First Motion to Supplement the Administrative Record and it **GRANTS-IN-PART** Plaintiff's Second Motion to Supplement the Administrative Record.

For the reasons set forth above, the Court **GRANTS** Plaintiff's Motion for Judgment on the Administrative Record and **DENIES** the Government's Cross-Motion for Judgment on the Administrative Record.  As explained, for now the Court stays the entry of judgment, and if it becomes necessary, the precise scope of a permanent injunction will be the subject of future proceedings.  Until corrective action is taken, voluntarily or by Court order, the preliminary injunction shall remain in effect.

s/ Edward J. Damich
EDWARD J. DAMICH
Judge